# GAS PURCHASE CONTRACT

Between CROSS TIMBERS ENERGY SERVICES, INC. as Seller

and DUKE ENERGY FIELD SERVICES, LP as Buyer

dated April 1, 2002

NHC 0127-00*

## INDEX

| SECTION | | PAGE |
|---|---|---|
| 1. | COMMITMENT | 1 |
| 2. | DELIVERY POINTS | 1 |
| 3. | DELIVERY PRESSURE | 1 |
| 4. | QUANTITY | 1 |
| 5. | PRICE | 2 |
| 6. | TERM | 3 |
| 7. | ADDRESSES AND NOTICES | 3 |
| | SIGNATURE PAGE | 4 |

### EXHIBIT A  GENERAL TERMS AND CONDITIONS

| | | |
|---|---|---|
| A. | DEFINITIONS | A-1 |
| B. | DELIVERY DATE | A-1 |
| C. | METERING AND MEASUREMENT | A-2 |
| D. | DETERMINATION OF GAS COMPOSITION | A-2 |
| E. | QUALITY OF GAS | A-3 |
| F. | BILLING AND PAYMENT | A-3 |
| G. | FORCE MAJEURE | A-4 |
| H. | WARRANTY OF TITLE | A-4 |
| I. | ROYALTY AND OTHER INTERESTS | A-4 |
| J. | SEVERANCE AND SIMILAR TAXES | A-4 |
| K. | INDEMNIFICATION AND RESPONSIBILITY FOR INJURY OR DAMAGE | A-5 |
| L. | RIGHT OF WAY | A-5 |
| M. | ASSIGNMENT | A-5 |
| N. | MISCELLANEOUS PROVISIONS | A-5 |


PLAINTIFF'S EXHIBIT 18

CONFIDENTIAL


BEER ETAL v XTO
EXHIBIT 12
XTO 1000
Page 1 of 12

# GAS PURCHASE CONTRACT

This Contract is entered as of the 1st day of April 2002 between **CROSS TIMBERS ENERGY SERVICES, INC.** ("Seller") and **DUKE ENERGY FIELD SERVICES, LP** ("Buyer").

For and in consideration of the mutual covenants contained herein, the parties agree as follows:

1. **COMMITMENT.** Seller will sell and deliver and Buyer will purchase and receive all gas delivered by Seller at the interconnection between Timberland Gathering and Processing Company, Inc., and DEFS at the DEFS 45609 receipt located in Section 27, Township 5N, Range 19E, Texas County, Oklahoma. Definitions and General Terms and Conditions included in this Contract are attached as Exhibit A and incorporated by reference.

2. **DELIVERY POINTS.** The Delivery Points for gas to be delivered by Seller to Buyer for existing sources of production will be at the interconnect between Timberland Gathering and Processing Company, Inc., and DEFS at the DEFS 45609 receipt point located in Section 27, Township 5N, Range 19E, Texas County, Oklahoma.

3. **DELIVERY PRESSURE.** Seller will deliver the gas at the Delivery Points at a pressure sufficient to enable it to enter Buyer's Facilities against the working pressure at reasonably uniform rates of delivery, not to exceed the maximum allowable operating pressure established by Buyer or pressures that prevent others from producing ratably.

4. **QUANTITY.** (a) Seller shall deliver and Buyer shall purchase and take Seller's gas subject to the operating conditions and capacity of Buyer's Facilities and resale markets. Buyer will use commercially reasonable efforts to market gas for resale and operate its facilities in an effort to maintain consistent takes of all available quantities. If Buyer takes less than the full quantities available, Buyer will use commercially reasonable efforts to purchase gas covered by this Contract ratably with its purchases of similar gas in each common gathering system or area within its capabilities using existing facilities, in compliance with Buyer's existing contracts and with applicable laws and regulations, including ratable purchases from Buyer's affiliates.

(b) Seller may dispose of any gas not taken by Buyer for any reason, including events of force majeure, subject to Buyer's right to resume purchases at any subsequent time. In the event Buyer does not take gas for 15 consecutive days and Seller secures a different temporary market, Buyer may resume purchases only upon 15 days' advance written notice as of the beginning of a month unless otherwise agreed.

CONFIDENTIAL

- 1 -

EXHIBIT 12
Page 2 of 12
XTO 1001

(c) Seller will use commercially reasonable efforts to deliver gas meeting the quality requirements and to avoid delivery of Inferior Liquids as defined in Exhibit A, Section A(g). In the event the gas at any Delivery Point becomes insufficient in volume, quality, or pressure, Buyer may cease gas takes from those points so long as the condition exists, or may terminate this Contract as to any affected gas upon 30 days advance written notice to Seller.

5. **PRICE.**

5.1 **Consideration.** As full consideration for the gas and all its components delivered to Buyer each month at each Delivery Point, Buyer shall pay Seller the following:

(a) Beginning April 1, 2002 and continuing through December 31, 2002 Buyer shall pay Seller 100% plus $0.015 per MMBtu of the "Index Price" identified in Paragraph 5.2 below for Seller's first 10,000 MMBtu's per day delivered at the Point of Delivery.

(b) Beginning January 1, 2003 and continuing through March 31, 2003 Buyer shall pay Seller 100% plus $0.005 per MMBtu of the "Index Price" identified in Paragraph 5.2 below for Seller's first 10,000 MMBtu's per day delivered at the Point of Delivery.

(c) Beginning April 1, 2002 and continuing through March 31, 2003, Buyer shall pay Seller 100% plus $0.005 per MMBtu of the "Index Price" identified in Paragraph 5.2 for all of Seller's gas deliveries exceeding 10,000 MMBtu's per day delivered at the Point of Delivery. The compensation payable under this contract supersedes Amendment to Gas Receipt and Delivery Agreement dated December 31, 1999, and includes the value of all gas components from which Buyer might derive value, including helium, sulfur, $CO_2$, and other non-hydrocarbons, and there is no separate value calculation for those components is to be done.

5.2 **Index Price.** The "Index Price" shall be calculated by Buyer per MMBtu as published in *Inside F.E.R.C.'s Gas Market Report* in its first publication of the month in which the gas is delivered for "Prices of Spot Gas Delivered to Pipelines" for Panhandle Eastern Pipe Line, Texas, Oklahoma (mainline). In the event that the published price referenced in this paragraph is discontinued or materially modified, its comparable successor shall be used, or in the absence of a comparable successor, Buyer shall select another publication that enables calculation of an Index Price closely comparable to that previously used. If a change in the Index Price calculation becomes necessary, Buyer will so inform Seller by written notice, setting forth the changes.

CONFIDENTIAL

BEER, ETAL v XTO
Case No. CIV-07-798-L
EXHIBIT 12
XTO 10012
Page 3 of 12

5.3 **Volume Commitment Fee.** For the term of this contract Buyer agrees to waive Seller's volume commitment to the NGPL Delivery Point as described in Article II, Paragraph 2.2 of the Gas Receipt and Delivery Agreement dated August 22, 1996.

5.4 **Delivery Point Fees.** For the term of this Contract and only for gas purchased under this Contract, Buyer and Seller agree to replace all Delivery Point fees pursuant to Paragraph 4.1, Article IV of Gas Receipt and Delivery Agreement dated August 22, 1996 with a fee equal to $0.015 per MMBtu. Such fee shall be applied to all MMBtu's purchased pursuant to this contract and shall be deducted from the proceeds otherwise due Seller hereunder.

6. **TERM.** This Contract shall become effective April 1, 2002 and remain in effect through March 31, 2003.

7. **ADDRESSES AND NOTICES.** Either party may give notices to the other party or parties by first class mail postage prepaid, by overnight delivery service, or by facsimile with receipt confirmed at the following addresses or other addresses furnished by a party by written notice. Unless Seller objects in writing, Buyer may also use Seller's current address for payments.

Notices to Seller:   Cross Timbers Energy Services, Inc.
Attn: Gas Contract Administration
810 Houston St., Ste. 2000
Fort Worth, TX 76102-6298
PHONE: (817) 870-2800
FAX: (817) 870-1671

Notices to Buyer - General:   Duke Energy Field Services, LP
(Gas Acquisitions and Accounting)   6120 S. Yale, Suite 1100
Tulsa, OK 74136
PHONE: (918) 492-3331
FAX: (918) 523-1179

Ownership changes, Division   Duke Energy Field Services, LP
Orders:   Division Orders
6120 S. Yale, Suite 1100
PHONE: (918) 492-3331
FAX: (918) 523-1170

CONFIDENTIAL




BEER, ETAL v XTO
EXHIBIT 12
Page 4 of 12

IN WITNESS WHEREOF, the parties have hereto set their hands in person or by their duly authorized representatives as of the date set first forth above.

| CROSS TIMBERS ENERGY SERVICES, INC. | DUKE ENERGY FIELD SERVICES, LP |
|---|---|
| By_____ | By_____ |
| Title_____ | D. A. Stell, Vice President |
| Executed on_____, 2002 | Executed on_____, 2002 |
| Seller | Buyer |

Signature Sheet for Gas Purchase Contract
Dated as of _____, 2002

CONFIDENTIAL

EXHIBIT 12
Page 5 of 12
XTO 1004



# EXHIBIT A TO GAS PURCHASE CONTRACT
# BETWEEN CROSS TIMBERS ENERGY SERVICES, INC. AS "SELLER"
# AND DUKE ENERGY FIELD SERVICES, LP AS "BUYER"

## DATED AS OF APRIL 1, 2002

## GENERAL TERMS & CONDITIONS

### A. DEFINITIONS

Except where the context indicates a different meaning or intent, and whether or not capitalized, the following terms will have meanings as follows:

a. <u>Affiliate</u> - a company (i) in which a party owns directly or indirectly more than 50% of the issued and outstanding voting stock or other equity interests; or (ii) which owns directly or indirectly more than 50% of the issued and outstanding voting stock or equity interests of the party; or (iii) in which a company described in (ii) owns, directly or indirectly, more than 50% of the issued and outstanding voting stock or other equity interests, and coventurers of Duke Energy Field Services, LLC or its successors.

b. <u>Btu</u> - British Thermal Unit, or the quantity of heat required to raise the temperature of 1 pound of water 1°F at a starting temperature of 59.5°F. <u>MMBtu</u> - one million Btu's.

c. <u>Buyer's Facilities</u> - The gas delivered by Seller will be gathered into gathering systems and may be redelivered to a processing plant or plants for the removal of NGL's together with gas produced from other properties. The gathering systems and plant or plants, or successor facilities, are "Buyer's Facilities" whether owned by Buyer, an affiliate of Buyer, or an unaffiliated third party. No facilities downstream of the processing plant or plants other than short connecting lines to transmission lines are included in "Buyer's Facilities."

d. <u>Day</u> - a period of 24 consecutive hours beginning and ending at 9:00 a.m. Central Clock Time.

e. <u>Force Majeure</u> - see Section H.2 below.

f. <u>Gas</u> - all natural gas available from the wells or acreage subject to this Contract that arrives at the surface in the gaseous phase, including all hydrocarbon and non-hydrocarbon components, casinghead gas produced from oil wells, gas well gas, stock tank vapors, and other sources of production, unless specifically excluded in the Commitment Section above.

g. <u>Inferior Liquids</u> - Mixed crude oil, slop oil, salt water, nuisance liquids, and other liquids recovered by Buyer in its gathering system or at plant inlet receivers. Revenues from Inferior Liquids, drips, and other gathering system liquids will be retained by Buyer to defray costs of treating and handling; Buyer will not allocate or pay for those Liquids.

h. <u>Mcf</u> - 1,000 cubic feet of gas at a standard condition of 60°F and 14.73 psia.

i. <u>Month</u> - a calendar month beginning on the first Day of a month.

j. <u>NGL</u> or <u>NGL's</u> - ethane and heavier liquefiable hydrocarbons separated from gas and any incidental methane in NGL after processing. See Section 5.3(i) through (v) for particular components.

k. <u>Delivery Points</u> - whether one or more, see Sections 2, B.1, and B.2.

l. <u>psi</u> - pounds per square inch; <u>psia</u> - psi absolute; <u>psig</u> - psi gauge.

m. <u>Residue gas</u> - merchantable hydrocarbon gas available for sale from Buyer's Facilities after processing and hydrocarbon gas resold without first being processed.

n. <u>TF&S</u> - NGL transportation, fractionation, and storage, see Section 5.3.

### B. DELIVERY DATE; COMPRESSION

**B.1 Existing Sources Delivery Date.** As to committed sources of production already connected to Buyer's Facilities, deliveries under this Contract will commence as of April 1, 2002.

**B.2 Delivery Rates.** Seller will have agents or employees available at all reasonable times to receive from Buyer's dispatchers advice and directions for changes in the rates of delivery of gas as required by Buyer from time to time.

**B.3 Options to Compress; Disconnection.** If Seller's wells become incapable of delivering gas into Buyer's Facilities, neither party will be obligated to compress, but either party will have the option to do so. A party providing compression facilities shall also provide sufficient pulsation dampening equipment so that measurement at the Point(s) of Delivery will not be affected by pulsation. If neither party elects to compress within a reasonable time after the need for compression appears, Buyer upon written request of Seller will either arrange promptly to provide

CONFIDENTIAL

EXHIBIT 12
BELL, ET AL v XTO
Case No CIV-07-798-L
XTO 1005

compression or release the gas sources unable to deliver gas into Buyer's Facilities as to the then-producing formations from commitment under this Contract.

## C. METERING AND MEASUREMENT

**C.1 Buyer to Install Meters.** Buyer and/or an unaffiliated third party will maintain and operate orifice meters or other measuring devices of standard make at or near the Delivery Points. Except as otherwise specifically provided to the contrary in this Section D, orifice meters or other measurement devices will be installed and volumes computed in accordance with accepted industry practice. Buyer may re-use metering equipment not meeting current standards but meeting 1985 or later published standards for gas sources not expected to deliver in excess of 100 Mcf per day. A party providing compression facilities will also provide sufficient pulsation dampening equipment to prevent pulsation from affecting measurement at the Delivery Points. Electronic recording devices may be used. Seller will have access to Buyer's metering equipment at reasonable hours, but only Buyer will calibrate, adjust, operate, and maintain it.

**C.2 Unit of Volume.** The unit of volume will be one cubic foot of gas at a base temperature of 60°F and at a pressure base of 14.73 psia. Computations of volumes will follow industry accepted practice.

**C.3 Pressure, Temperature.** Buyer may measure the atmospheric pressure or may assume the atmospheric pressure to be 14.65 psia. Buyer may determine gas temperature by using a recording thermometer; otherwise, the temperature will be assumed to be 60°F. The specific gravity will be determined annually, or more often as Buyer deems advisable.

**C.4 Check Meters.** Seller may install, maintain, and operate in accordance with accepted industry practice at its own expense pressure regulators and check measuring equipment of standard make using separate taps. Check meters shall not interfere with operation of Buyer's equipment. Buyer will have access to Seller's check measuring equipment at all reasonable hours, but only Seller will calibrate, adjust, operate, and maintain it.

**C.5 Meter Tests.** Annually, or more often as Buyer deems advisable, Buyer will verify the accuracy of Buyer's measuring equipment, and Seller or its lease operator will verify the accuracy of any check measuring equipment. If Seller's lease operator or Buyer notifies the other that it desires a special test of any measuring equipment, they will cooperate to secure a prompt verification of the accuracy of the equipment. If either at any time observes a variation between the delivery meter and the check meter, it will promptly notify the other, and both will then cooperate to secure an immediate verification of the accuracy of the equipment. Only if so requested in advance by Seller in writing, Buyer will give Seller's lease operator reasonable advance notice of the time of all special tests and calibrations of meters and of sampling for determinations of gas composition and quality, so that the lease operator may have representatives present to witness tests and sampling or make joint tests and obtain samples with its own equipment. Seller will give or cause its lease operator to give reasonable advance notice to Buyer of the time of tests and calibrations of any check meters and of any sampling by Seller for determination of gas composition and quality.

**C.6 Correction of Errors.** If at any time any of the measuring or testing equipment is found to be out of service or registering inaccurately in any percentage, it will be adjusted promptly to read accurately within the limits prescribed by the manufacturer. If any measuring equipment is found to be inaccurate or out of service by an amount exceeding the greater of (i) two percent at a recording corresponding to the average hourly rate of flow for the period since the last test, or (ii) 100 Mcf per month, then previous readings will be corrected to zero error for any known or agreed period. The volume of gas delivered during that period will be estimated by the first feasible of the following methods:

(i) using the data recorded by any check measuring equipment if registering accurately;

(ii) correcting the error if the percentage of error is ascertainable by calibration, test, or mathematical calculation; or

(iii) by estimating the quantity or quality delivered based on deliveries under similar conditions during a period when the equipment was registering accurately. No adjustment will be made for inaccuracies that do not exceed the greater of (i) two percent of affected volumes, or (ii) 100 Mcf per month.

**C.7 Meter Records.** The parties will preserve for a period of at least two years all test data, charts and similar measurement records. The parties will raise metering questions as soon as practicable after the time of production. No party will have any obligation to preserve metering records for more than two years except to the extent that a metering question has been raised in writing and remains unresolved.

## D. DETERMINATION OF GAS COMPOSITION

Annually, or more often as Buyer and/or an unaffiliated third party deems advisable, Buyer will obtain a representative sample of Seller's gas delivered at each Delivery Point; or Buyer may use continuous samplers. By chromatography or other accepted method in the industry, Buyer will determine the composition and gross heating value of the hydrocarbon components of Seller's gas in Btu per cubic foot on a dry basis at

- A 2 -

CONFIDENTIAL EXHIBIT 12
BEER, ETAL v. XTO
V-0179
XTO 1006
Page 7 of 12

standard conditions, then adjusting the result for the water vapor content of the gas (by either the volume or Btu content method), using an industry accepted practice. No heating value will be credited for Btu's in $H_2S$ or other nonhydrocarbon components. The first determination of Btu content for Seller's deliveries will be made within a reasonable time after deliveries of gas begin. If continuous samplers are used, the determinations will apply to the gas delivered while the sampler was installed. If not, the determination will apply until the first day of the month following the next determination.

## E. QUALITY OF GAS

E.1 Buyer shall not be obligated to accept Gas for transportation which does not meet the following quality provisions:
a. Solids: The Gas shall be free from objectionable odors, solid matter, dust, gums and gum - forming constituents which might interfere with its merchantability, cause injury to, or interfere with proper operations of the lines, meters, regulators, or other appliances through which it flows.
b. Oxygen: The Gas shall not have in excess of fifty (50) parts of oxygen per million.
c. Carbon Dioxide: The Gas shall not contain more than two percent (2%) of carbon dioxide (by volume).
d. Liquids: The Gas shall be free of water and hydrocarbons in liquid form.
e. Hydrogen Sulfide: The Gas shall not contain more than one (1) grain of hydrogen sulfide per one hundred (100) cubic feet.
f. Total Sulfur: The Gas shall not contain more than twenty (20) grains of total sulfur per one hundred (100) cubic feet.
g. Bacteria: The gas shall not contain any active bacteria or bacterial agents, including but not limited to sulfate reducing bacteria or acid producing bacteria.
h. Heating Value: The Gas shall have a total or gross heating value of not less than nine hundred and fifty (950) BTU per cubic foot (14.73 dry) at the Delivery Point.
i. Temperature: The Gas shall not have a temperature of more than one hundred twenty (120) degrees Fahrenheit.
j. Other: The Gas shall not contain any hazardous or toxic substances.

In the event that a pipeline receiving the Gas sold hereunder has more stringent quality specifications than the specification set out above, the Gas delivered hereunder by Seller shall conform to the such more stringent standards.

E.2 **Quality Tests.** Buyer will make determinations of conformity of the gas with the above specifications using procedures generally accepted in the gas industry. Such determinations will be made as often as Buyer reasonably deems necessary. If in the lease operator's judgment the result of any such test or determination is inaccurate, Buyer upon request will again conduct the questioned test or determination. The costs of the additional test or determination will be borne by Seller unless it shows the original test or determination to have been materially inaccurate.

E.3 Rights as to Off Specification Gas.
a. If any of the gas delivered by Seller fails to meet the quality specifications stated in this Section, Buyer may at its option accept delivery of and pay for such gas or discontinue or curtail taking of gas at any Delivery Point whenever its quality does not conform to the quality specifications. If Buyer accepts delivery of off specification gas from Seller or incurs costs relating to inferior gas quality in its gathering system, Buyer may deduct from the proceeds otherwise payable a reasonable fee for monitoring the gas quality and treating and handling the gas. Buyer typically adjusts gas quality deduction levels annually, but may do so more often if needed.
b. If Buyer is declining to take off quality gas, Seller may by written notice to Buyer request a release of the affected gas from commitment under this Contract. In that event, Buyer will within 30 days either (i) waive its right to refuse to take the affected off quality gas (subject to its right to charge treating fees under this Section F) and again take gas from the affected sources, or (ii) release the affected gas from commitment under this Contract.

## F. BILLING AND PAYMENT

F.1 Statement and Payment Date. Buyer will render to Seller on or before the last working day of each month a statement showing the volume of gas delivered by Seller during the preceding month. Buyer will make payment to Seller on or before the last day of each month for all gas delivered during the preceding month. As between the parties, late payments by Buyer and recoupments/refunds from Seller will carry simple interest at the lesser of 6% per annum or the maximum lawful interest rate; provided that no interest will accrue as to monthly principal amounts of less than $1,000 due for less than one year when paid. The parties waive any rights to differing interest rates. Except as limited in Section G.2 below, Buyer may recover any overpayments or collect any amounts due from Seller to Buyer for any reason at any time under this or other transactions by deducting them from proceeds payable to Seller.
F.2 Audit Rights; Time Limit to Assert Claims.

CONFIDENTIAL
BEER, ETAL v XTO
EXHIBIT 2
XTO 1007
Page 8 of 12

a. Subject to the execution of a reasonable confidentiality obligation, each party will have the right during reasonable business hours to examine the books, records and charts of the other party and to review its own records to the extent necessary to verify performance of this Contract and the accuracy of any statement, charge or computation. If any examination reveals an inaccuracy in any payment, the appropriate adjustment will promptly be made.

b. No adjustment for any billing or payment will be made, and payments shall be final after the lapse of two years from their due date except to the extent that (i) either party has noted a specific exception to the other party in writing during that period, or (ii) underpayment claims arise with respect to severance tax and royalty liabilities and related interest.

c. No party will have any right to recoup or recover prior overpayments or underpayments that result from errors that occur in spite of good faith performance if the amounts involved do not exceed $10/month/meter. Either party may require prospective correction of such errors.

F.3 Metering Records Availability. Buyer will not be required to furnish gas volume records relating to electronic recording devices for gas meters other than daily volume information unless there are indications the meter was not operating properly.

## G. FORCE MAJEURE

G.1 Suspension of Performance. In the event either party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this Contract, other than to make payments due, the obligations of that party, so far as they are affected by force majeure, will be suspended during the continuance of any inability so caused, but for no longer period. The party whose performance is affected by force majeure will provide notice to the other party, which notice may initially be oral, followed by a written notification.

G.2 Force Majeure Definition. "Force majeure" means acts of God, strikes, lockouts or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, storms, floods, washouts, arrests and restraints of governments and people, civil disturbances, fires, explosions, breakage or accidents to machinery or lines of pipe, freezing of wells or lines of pipe, partial or entire failure of wells or sources of supply of gas, inability to obtain at reasonable cost servitudes, right of way grants, permits, governmental approvals, or licenses, inability to obtain at reasonable cost materials or supplies for constructing or maintaining facilities, and other causes, whether of the kind listed above or otherwise, not within the control of the party claiming suspension and which by the exercise of reasonable diligence the party is unable to prevent or overcome.

G.3 Labor Matters Exception. The settlement of strikes or lockouts will be entirely within the discretion of the party having the difficulty, and settlement of strikes, lockouts, or other labor disturbances when that course is considered inadvisable is not required.

## H. WARRANTY OF TITLE

Seller warrants that it has good title and processing rights to the gas delivered, free and clear of any and all liens, encumbrances, and claims whatsoever, and that Seller has good right and lawful authority to sell the same. Seller grants to Buyer the right to process Seller's gas for extraction of NGL's and other valuable components. If Seller's title or right to receive any payment is questioned or involved in litigation, Buyer will have the right to withhold the contested payment without interest until title information is received, during the pendency of litigation, until the title or right to receive the questioned payments are freed from question, or until Seller furnishes security for repayment acceptable to Buyer. Without impairment of Seller's warranty of title to gas and gas processing rights, if Seller owns less than full title to the gas delivered, payments will be made only in the proportion that Seller's interest bears to the entire title to the gas.

## I. ROYALTY AND OTHER INTERESTS

Seller is responsible for all payments to the owners of all working interests, mineral interests, royalties, overriding royalties, bonus payments, production payments and the like. Buyer assumes no liability to Seller's working or mineral interest, royalty, or other interest owners under this Contract.

## J. SEVERANCE AND SIMILAR TAXES

J.1 Included in Price. Reimbursement to Seller for Seller's full liability for severance and similar taxes levied upon Seller's gas production is included in the prices payable under this Contract, regardless of whether some included interests may be exempt from taxation.

J.2 Tax Responsibilities and Disbursements. Seller shall bear, and unless otherwise required by law, will pay to taxing authorities all severance, production, excise, sales, gross receipts, occupation, and other taxes imposed upon Seller with respect to the gas on or prior to delivery to Buyer. Buyer will bear and pay all taxes imposed upon Buyer with respect to the gas after delivery to Buyer.

CONFIDENTIAL EXHIBIT 12
BEER, ETAL v XTO
XTO 1008
Page 9 of 12

## K. INDEMNIFICATION AND RESPONSIBILITY FOR INJURY OR DAMAGE

K.1 Title, Royalty, and Severance Taxes. SELLER RELEASES AND AGREES TO DEFEND, INDEMNIFY, AND SAVE BUYER, ITS AFFILIATES, AND THEIR OFFICERS, EMPLOYEES, AND AGENTS ("BUYER INDEMNITEES") HARMLESS FROM AND AGAINST ALL CLAIMS, CAUSES OF ACTION, LIABILITIES, AND COSTS (INCLUDING REASONABLE ATTORNEYS' FEES AND COSTS OF INVESTIGATION AND DEFENSE) RELATING TO (a) SELLER'S TITLE TO GAS AND GAS PROCESSING RIGHTS, (b) PAYMENTS TO OTHER WORKING AND MINERAL INTERESTS, AND OTHER OWNERS, AND (c) ROYALTY AND OVERRIDING ROYALTY PAYMENTS, SALES, SEVERANCE, AND SIMILAR TAXES, THAT ARE THE RESPONSIBILITY OF SELLER UNDER SECTIONS I, J, AND K ABOVE.

K.2 Responsibility for Injury or Damage. As between the parties, Seller will be in control and possession of the gas deliverable hereunder and responsible for any injury or damage relating to handling or delivery of gas until the gas has been delivered to Buyer; after delivery, Buyer will be deemed to be in exclusive control and possession and responsible for any injury or damage relating to handling or gathering of gas. THE PARTY HAVING RESPONSIBILITY UNDER THE PRECEDING SENTENCE SHALL RELEASE, DEFEND, INDEMNIFY, AND HOLD THE OTHER PARTY, ITS AFFILIATES, AND THEIR OFFICERS, EMPLOYEES, AND AGENTS HARMLESS FROM AND AGAINST ALL CLAIMS, CAUSES OF ACTION, LIABILITIES, AND COSTS (INCLUDING REASONABLE ATTORNEYS' FEES AND COSTS OF INVESTIGATION AND DEFENSE) ARISING FROM ACTUAL AND ALLEGED LOSS OF GAS, PERSONAL INJURY, DEATH, AND DAMAGE FOR WHICH THE PARTY IS RESPONSIBLE UNDER THIS SECTION L.2; PROVIDED THAT NEITHER PARTY WILL BE INDEMNIFIED FOR ITS OWN NEGLIGENCE OR THAT OF ITS AGENTS, SERVANTS, OR EMPLOYEES.

## L. RIGHT OF WAY

Insofar as Seller's lease or leases permit and insofar as Seller or its lease operator may have any rights however derived (whether pursuant to oil and gas lease, easement, governmental agency order, regulation, statute, or otherwise), Seller grants to Buyer and Buyer's gas gathering contractor, if any, and their assignees the right of free entry and the right to lay and maintain pipelines, meters, and any equipment on the lands or leases subject to this Contract as reasonably necessary in connection with the purchase or handling of Seller's gas. All pipelines, meters, and other equipment placed by Buyer or Buyer's contractors on the lands and leases will remain the property of the owner and may be removed by the owner at any time. Without limitation, Buyer or its gathering contractor may disconnect and remove measurement and other facilities from any Delivery Point due to low volume, quality, term expiration, or other cause.

## M. ASSIGNMENT

M.1 Binding on Assignees. Either party may assign this Contract. This Contract is binding upon and inures to the benefit of the successors, assigns, heirs, personal representatives, and representatives in bankruptcy of the parties, and, subject to any prior dedications by the assignee, shall be binding upon any purchaser of Buyer's Facilities and upon any purchaser of the properties of Seller subject to this Contract. Nothing contained in this Section will prevent either party from mortgaging its rights as security for its indebtedness, but security is subordinate to the parties' rights and obligations under this Contract.

M.2 Notice of Assignment. Any assignment or sublease by Seller of any oil and gas properties or any gas rights contracted to Buyer will be made expressly subject to the provisions of this Contract. No transfer of or succession to the interest of Seller, however effected, will bind Buyer unless and until the original instrument or other proper proof that the claimant is legally entitled to an interest has been furnished to Buyer at its Division Order address noted in the Notices Section or subsequent address.

## N. MISCELLANEOUS PROVISIONS

N.1 Governing Law. THIS CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OKLAHOMA, without reference to those that might refer to the laws of another jurisdiction.

CONF EXHIBIT 12 BEER, ETAL v. XTO Case No. CIV-07-798-L XTO 2009
Page 10 of 12

N.2  **Default and Nonwaiver.** A waiver by a party of any one or more defaults by the other in the performance of any provisions of this Contract will not operate as a waiver of any future default or defaults, whether of a like or different character.

N.3  **Counterparts.** This Contract may be executed in any number of counterparts, all of which will be considered together as one instrument, and this Contract will be binding upon all parties executing it, whether or not executed by all parties owning an interest in the producing sources affected by this Contract.

N.4  **Negotiations; Entire Agreement; Amendment; No Third Party Beneficiaries.** The language of this Contract shall not be construed in favor of or against either Buyer or Seller, but shall be construed as if the language were drafted mutually by both parties. This Contract constitutes the final and complete agreement between the parties. There are no oral promises, prior agreements, understandings, obligations, warranties, or representations between the parties relating to this Contract other than those set forth herein. All waivers, modifications, amendments, and changes to this Contract shall be in writing and executed by the authorized representatives of the parties. The relations between the parties are those of independent contractors; this Contract creates no joint venture, partnership, association, other special relationship, or fiduciary obligations. There are no third party beneficiaries of Buyer's sales contracts or of this Contract.

N.5  **Ratification.** If requested in writing by Buyer of other interest owners, this Contract may be ratified and adopted by any owner of an interest in any oil and gas properties subject to this Contract or any lands or leases with which those oil and gas properties may be pooled or unitized, by execution and delivery to Buyer of an instrument in writing ratifying and adopting this Contract insofar as the owner's interest in any such land, lease or oil and gas properties is concerned, and the ratifying owner will become a party Seller to this Contract with like force and effect as though the owner had executed this Contract as amended as of the time of execution of the ratification, and all of the terms and provisions of this Contract as amended to the date of the ratification will become binding upon Buyer and the ratifying owner.

N.6  **Compliance with Laws and Regulations.** This Contract is subject to all valid statutes and rules and regulations of any duly constituted federal or state authority or regulatory body having jurisdiction. Neither party will be in default as a result of compliance with laws and regulations.

N.7  **Fees and Costs; Damages.** In the event of a breach, the parties are entitled to recover as their sole and exclusive damages for breach of the price and quantity obligations under this Contract the price for gas taken by Buyer in the case of Seller and the lost margin less avoided costs in the case of Buyer. In the event mediation or arbitration is necessary to resolve a dispute other than one arising under the indemnification obligations of this Contract, each party agrees to bear its own attorneys' fees and costs of investigation and defense, and each party waives any right to recover those fees and costs from the other party or parties.

N.8  **Mutual Waiver of Certain Remedies.** Except as to the parties' indemnification obligations, NEITHER PARTY SHALL BE LIABLE OR OTHERWISE RESPONSIBLE TO THE OTHER FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, FOR LOST PRODUCTION, OR FOR PUNITIVE DAMAGES AS TO ANY ACTION OR OMISSION, WHETHER CHARACTERIZED AS A CONTRACT BREACH OR TORT, THAT ARISES OUT OF OR RELATES TO THIS CONTRACT OR ITS PERFORMANCE OR NONPERFORMANCE.

N.9  **Arbitration.** The parties desire to resolve any disputes that may arise informally, if possible. All disputes arising out of or relating to this Contract that are not resolved by agreement of the parties must be resolved using the provisions of this Section 0.9. To that end, if a dispute or disputes arise out of or relating to this Contract, a party shall give written notice of the disputes to the other involved parties, and each party will appoint an employee to negotiate with the other party concerning the disputes. If the disputes have not been resolved by negotiation within 30 days of the initial dispute notice, the disputes shall be resolved by arbitration in accordance with the then current Comprehensive Arbitration Rules and Procedures of the Center for Public Resources Institute for Dispute Resolution ("Rules") and this Section 0.9. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16, and the Rules, to the exclusion of any provision of state law inconsistent with them. The arbitration shall be initiated by a party seeking arbitration by written notice transmitted to the other party or parties to be involved. The parties shall select one disinterested arbitrator with at least ten years' experience in the natural gas industry or ten years' experience with natural gas law, and not previously employed by either party or its affiliates, and, if possible, shall be selected by agreement between the parties. If the parties cannot select an arbitrator by agreement within 15 days of the date of the notice of arbitration, a qualified arbitrator will be selected in accordance with the Rules. If the disputes involve an

CON EXHIBIT 12
BEER, ETAL v XTO
Page 11 of 12

amount greater than $100,000, they will be decided by a panel of three arbitrators with the above qualifications, one selected by each party, and the third selected by the party-appointed arbitrators, or in the absence of their agreement, pursuant to the Rules. The arbitrator(s) shall resolve the disputes and render a final award in accordance with the substantive law of the state referenced in Section O.1 above, "Governing Law." The arbitrator's award will be limited by the provisions set forth in Sections O.7, "Fees and Costs; Damages" and O.8 above, "Mutual Waiver of Certain Remedies." The arbitrator(s) shall set forth the reasons for the award in writing, and judgment on the arbitration award may be entered in any court having jurisdiction.

END OF EXHIBIT A TO
GAS PURCHASE CONTRACT

CONFID. EXHIBIT 12
XTO 1011
Page 12 of 12