# AMENDMENT TO GAS PURCHASE CONTRACT

NHC 012700B

This Amendment to Gas Purchase Contract ("Amendment") is entered into as of the first day of December 2005, by **CROSS TIMBERS ENERGY SERVICES, INC.** ("Seller") and **DUKE ENERGY FIELD SERVICES, LP** ("Buyer").

In consideration of the premises and of the mutual covenants contained herein, the parties agree to amend the Gas Purchase Contract dated November 1, 2004, DEFS' File No. NHC 012700B (the "Contract"), between the parties covering gas delivered at Meter Nos. 45609740 and 45609758, located in Section 27-T5N-R19E, Texas County, Oklahoma, as follows:

1. Effective December 1, 2005, the Term Section of the Contract is amended to read as follows:

   Through November 30, 2006 and from month to month thereafter until canceled by either party as of the end of a month upon 30 days advance written notice.

2. Effective December 1, 2005 Price Section (B) of the Contract is amended to read as follows:

   The price per MMBtu shall be the Index Price as published in the first publication for the month of deliveries in *Inside F.E.R.C.'s Gas Market Report* in the column titled "Prices of Spot Gas Delivered to Pipelines: for Panhandle Eastern Pipe Line Company: Texas, Oklahoma (mainline) ("Index Price") less **$0.01** per MMBtu dry.

3. The Contract is amended to the extent noted herein. In all other respects, it is confirmed and shall continue in full force and effect.

4. This Amendment may be executed in multiple counterparts, all of which shall be considered together as one instrument.

IN WITNESS WHEREOF, the parties have executed this Amendment in person or by their duly authorized representatives as of the date set forth above.

CROSS TIMBERS ENERGY SERVICES, INC.      DUKE ENERGY FIELD SERVICES LP

By _____               By _____
   TERRY SCHULTZ                            Dennis Stell, Managing Director
Title    PRESIDENT

Executed on _____              Executed on April 3, 200_
       SELLER                                         BUYER

PLAINTIFF'S EXHIBIT 23

CONFIDENTIAL

EXHIBIT 13
XTQ 1063
Page 1 of 5



## GAS PURCHASE CONTRACT

In consideration of the mutual covenants below, the parties identified below agree to sell and purchase natural gas under the terms of this Gas Purchase Contract dated as of November 1, 2004. The terms are those verbally agreed between the parties' representatives identified below. The General Terms and Conditions attached to this Contract are incorporated by reference.

**Buyer**
| Duke Energy Field Services |
| 6120 South Yale, Suite 1100 |
| Tulsa, Oklahoma 74136 |
| Cheryl Ogilvie  918-523-1183  918-492-3375 |

**Seller**
| Cross Timbers Energy Services, Inc. |
| 810 Houston Street, Suite 2000 |
| Fort Worth, Texas 76102-5298 |
| J.A. Lauderdale  817-870-2800  817-870-1671 |

**Term:** Through November 30 2005 and from month to month thereafter until canceled by either party as of the end of a month upon 30 days advance written notice.

**Pipeline:** PEPL

Meter No.: 45609 740 (Primary)
  45609758 (Secondary)
Lease/Well Name: Timberland PLD
Location: Sec. 27-T5N-R19E
Texas County, Oklahoma
Maximum quantity
MMBtu/day: Not Specified

(A) **Commitment.** Subject to capacity on Buyer's (or Buyer's designee's) pipeline and ratable takings, and subject to Seller's ability to deliver the gas sold and purchased hereunder at a pressure sufficient to enter the pipeline, Seller agrees to deliver and sell and Buyer agrees to receive and purchase all of Seller's owned and controlled gas produced from the committed source identified above. Seller will deliver and Buyer will receive Seller's gas at the Delivery Point(s) described herein.

(B) **Price.** The price per MMBtu shall be the Index Price as published in the first publication for the month of deliveries in *Inside F.E.R.C.'s Gas Market Report* in the column titled "Prices of Spot Gas Delivered to Pipelines" for Panhandle Eastern Pipe Line Company: Texas, Oklahoma (mainline) ("Index Price") less **$0.03** per MMBtu dry.

(C) **Low Volume.** For gas delivered at any metered Delivery Points at which the volume delivered to Buyer has an average monthly delivery volume of 450 Mcf or less ("Low Volume"), Seller shall pay Buyer a fee of $350.00 per month per meter to cover Buyer's administration and maintenance costs.

AGREED and ACCEPTED this 28th day of February 2005.   AGREED and ACCEPTED this ___ day of _____, 200_.

**DUKE ENERGY FIELD SERVICES, LP**   **CROSS TIMBERS ENERGY SERVICES, INC.**

By: _____   By: _____
Name: _____   Name: Jay Lauderdale
Title: _____   Title: Director Oil and Gas Trading

BEER, ETAL v XTO
Case No CIV-07-798-L
XTO 1064

CONFIDENTIAL



# GENERAL TERMS AND CONDITIONS

1. **GATHERING/TRANSPORTATION.** Seller shall arrange, pay for, and bear risks for gas deliveries to the Delivery Points, and Buyer shall arrange, pay for, and bear risks for gas handling and shipments from the Delivery Points.

2. **METERING AND MEASUREMENT**

   (a) <u>Buyer to Install Meters.</u> Buyer will install, maintain and operate orifice meters or other measuring devices of standard make at or near the Delivery Points. Except as otherwise specifically provided to the contrary in this Section D, orifice meters or other measurement devices will be installed and volumes computed in accordance with accepted industry practice. Buyer may re-use metering equipment not meeting current standards but meeting 1985 or later published standards for gas sources not expected to deliver in excess of 100 Mcf per day. A party providing compression facilities will also provide sufficient pulsation dampening equipment to prevent pulsation from affecting measurement at the Delivery Points. Electronic recording devices may be used. Seller will have access to Buyer's metering equipment at reasonable hours, but only Buyer will calibrate, adjust, operate, and maintain it.

   (b) <u>Unit of Volume.</u> The unit of volume will be one cubic foot of gas at a base temperature of 60°F and at a pressure base of 14.73 psia. Computations of volumes will follow industry accepted practice.

   (c) <u>Pressure, Temperature.</u> Buyer may measure the atmospheric pressure or may assume the atmospheric pressure to be 13.2 psia. Buyer may determine gas temperature by using a recording thermometer; otherwise, the temperature will be assumed to be 60°F. The specific gravity will be determined annually, or more often as Buyer deems advisable.

   (d) <u>Check Meters.</u> Seller may install, maintain, and operate in accordance with accepted industry practice at its own expense pressure regulators and check measuring equipment of standard make using separate taps. Check meters shall not interfere with operation of Buyer's equipment. Buyer will have access to Seller's check measuring equipment at all reasonable hours, but only Seller will calibrate, adjust, operate, and maintain it.

   (e) <u>Meter Tests.</u> Annually, or more often as Buyer deems advisable, Buyer will verify the accuracy of Buyer's measuring equipment, and Seller or its lease operator will verify the accuracy of any check measuring equipment. If Seller's lease operator or Buyer notifies the other that it desires a special test of any measuring equipment, they will cooperate to secure a prompt verification of the accuracy of the equipment. If either at any time observes a variation between the delivery meter and the check meter, it will promptly notify the other, and both will then cooperate to secure an immediate verification of the accuracy of the equipment. Only if so requested in advance by Seller in writing, Buyer will give Seller's lease operator reasonable advance notice of the time of all special tests and calibrations of meters and of sampling for determinations of gas composition and quality, so that the lease operator may have representatives present to witness tests and sampling or make joint tests and obtain samples with its own equipment. Seller will give or cause its lease operator to give reasonable advance notice to Buyer of the time of tests and calibrations of any check meters and of any sampling by Seller for determination of gas composition and quality.

   (f) <u>Correction of Errors.</u> If at any time any of the measuring or testing equipment is found to be out of service or registering inaccurately in any percentage, it will be adjusted promptly to read accurately within the limits prescribed by the manufacturer. If any measuring equipment is found to be inaccurate or out of service by an amount exceeding the greater of (i) two percent at a recording corresponding to the average hourly rate of flow for the period since the last test, or (ii) 100 Mcf per month, then previous readings will be corrected to zero error for any known or agreed period. The volume of gas delivered during that period will be estimated by the first feasible of the following methods:

   (i) using the data recorded by any check measuring equipment if registering accurately;

   (ii) correcting the error if the percentage of error is ascertainable by calibration, test, or mathematical calculation; or

   (iii) by estimating the quantity or quality delivered based on deliveries under similar conditions during a period when the equipment was registering accurately.

   No adjustment will be made for inaccuracies that do not exceed the greater of (i) two percent of affected volumes, or (ii) 100 Mcf per month.

   (g) <u>Meter Records.</u> The parties will preserve for a period of at least two years all test data, charts and similar measurement records. The parties will raise metering questions as soon as practicable after the time of production. No party will have any obligation to preserve metering records for more than two years except to the extent that a metering question has been raised in writing and remains unresolved.

3. **DETERMINATION OF GAS COMPOSITION**

   Annually, or more often as Buyer deems advisable, Buyer will obtain a representative sample of Seller's gas delivered at each Delivery Point; or Buyer may use continuous samplers. By chromatography or other accepted method in the industry, Buyer will determine the composition and gross heating value of the hydrocarbon components of Seller's gas in Btu per cubic foot on a dry basis at standard conditions, then adjusting the result for the water vapor content of the gas (by either the volume or Btu content method), using an industry accepted practice. No heating value will be credited for Btu's in $H_2S$ or other nonhydrocarbon components. The first determination of Btu content for Seller's deliveries will be made within a reasonable time after deliveries of gas begin. If continuous samplers are used, the determinations will apply to the gas delivered while the sampler was installed. If not, the determination will apply until the first day of the month following the next determination.

4. **QUALITY.** Seller's gas shall meet the quality specifications of the downstream transporting pipelines. Buyer shall not be obligated to purchase any natural gas that is

not merchantable or does not meet all specifications required by the transporting pipelines.

5. **BILLINGS AND PAYMENTS:** (a) **Payments.** Payments shall be made by Buyer to Seller on or before the last day of the month following the month of deliveries. Seller or Seller's Agent shall provide to Buyer a written statement of its owned and controlled percentage of interest in the volumes being delivered from the well(s) committed hereunder. Buyer will make payments to Seller for its owned and controlled percentage of interest in the production. As between the parties, late payments by Buyer and recoupments/refunds from Seller will carry simple interest at the lesser of 6% per annum or the maximum lawful interest rate. Except as limited in (b) below, Buyer may recover any overpayments or collect any amounts due from Seller to Buyer for any reason at any time under this or other transactions by deducting them from proceeds payable to Seller.

(b) Audit Rights; Time Limit to Assert Claims. (i) Subject to the execution of a reasonable confidentiality obligation, each party will have the right during reasonable business hours to examine the books, records and charts of the other party and to review its own records to the extent necessary to verify performance of this Contract and the accuracy of any statement, charge or computation. If any examination reveals an inaccuracy in any payment, the appropriate adjustment will promptly be made.

(ii) No adjustment for any billing or payment shall be made, and payments shall be final after the lapse of two years from their due date, except as to matters that either party has noted in a specific written objection to the other party during the two year period, unless within the two year period Buyer has made the appropriate correction. However, Seller's responsibilities for title to gas and gas processing rights, severance taxes, third party liabilities, and related interest are not affected by this subsection.

6. **WARRANTY OF TITLE.** Seller warrants that it owns or controls and has the right to sell the natural gas delivered for which Seller represents ownership or control and all related processing rights, and that the gas is free from all liens and adverse claims of any kind. Seller grants to Buyer the right to process Seller's gas for extraction of NGL's and other valuable components. If Seller's title or right to receive any payment is questioned or involved in litigation, Buyer will have the right to withhold the contested payment without interest until title information is received, until the title or right to receive the questioned payments are freed from question, or until Seller furnishes security for repayment acceptable to Buyer.

7. **ROYALTY AND OTHER INTERESTS.** Seller is responsible for all payments to the owners of all working interests, mineral interests, royalties, overriding royalties, bonus payments, production payments and the like. Buyer assumes no liability to Seller's working or mineral interest, royalty, or other interest owners under this Contract.

8. **TAX RESPONSIBILITIES.** Seller shall bear, and unless otherwise required by law, will pay to taxing authorities all severance, production, excise, sales, gross receipts, occupation, and other taxes imposed upon Seller with respect to the gas on or prior to delivery to Buyer. Buyer will bear and pay all taxes imposed upon Buyer with respect to the gas after delivery to Buyer. The price payable under this Agreement includes reimbursement to Seller of Texas state severance and similar taxes at Seller's full liability for those taxes, regardless of whether some interests in production may be exempt from taxation, and for any production related costs and gathering and compression costs incurred or paid by Seller, if any.

9. **INDEMNIFICATION AND RESPONSIBILITY FOR INJURY OR DAMAGE.**

(a) Title, Royalty, and Severance Taxes. SELLER RELEASES AND AGREES TO DEFEND, INDEMNIFY, AND SAVE BUYER, ITS AFFILIATES, AND THEIR OFFICERS, EMPLOYEES, AND AGENTS ("BUYER INDEMNITEES") HARMLESS FROM AND AGAINST ALL CLAIMS, CAUSES OF ACTION, LIABILITIES, AND COSTS (INCLUDING REASONABLE ATTORNEYS' FEES AND COSTS OF INVESTIGATION AND DEFENSE) RELATING TO (a) SELLER'S TITLE TO GAS AND GAS-PROCESSING RIGHTS, (b) PAYMENTS TO OTHER WORKING AND MINERAL INTERESTS, AND OTHER OWNERS, ROYALTY AND OVERRIDING ROYALTY PAYMENTS, AND (c) SALES, SEVERANCE, AND SIMILAR TAXES, THAT ARE THE RESPONSIBILITY OF SELLER UNDER THIS CONTRACT.

(b) Responsibility for Injury or Damage. As between the parties, Seller will be in control and possession of the gas deliverable hereunder and responsible for any injury or damage relating to handling or delivery of gas until the gas has been delivered to Buyer; after delivery, Buyer will be deemed to be in exclusive control and possession and responsible for any injury or damage relating to handling or gathering of gas. THE PARTY HAVING RESPONSIBILITY UNDER THE PRECEDING SENTENCE SHALL RELEASE, DEFEND, INDEMNIFY, AND HOLD THE OTHER PARTY, ITS AFFILIATES, AND THEIR OFFICERS, EMPLOYEES, AND AGENTS HARMLESS FROM AND AGAINST ALL CLAIMS, CAUSES OF ACTION, LIABILITIES, AND COSTS (INCLUDING REASONABLE ATTORNEYS' FEES AND COSTS OF INVESTIGATION AND DEFENSE) ARISING FROM ACTUAL AND ALLEGED LOSS OF GAS, PERSONAL INJURY, DEATH, AND DAMAGE FOR WHICH THE PARTY IS RESPONSIBLE UNDER THIS SECTION; PROVIDED THAT NEITHER PARTY WILL BE INDEMNIFIED FOR ITS OWN NEGLIGENCE OR THAT OF ITS AGENTS, SERVANTS, OR EMPLOYEES.

10. **FORCE MAJEURE.** (a) If either party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this Contract, other than to make payments due, the obligations of that party, so far as they are affected by force majeure, will be suspended during the continuance of any inability so caused, but for no longer period. The party whose performance is affected by force majeure will provide notice to the other party, which notice may initially be oral,

CONFIDENTIAL



PUR S05 POI Short Form S TX 031804

**EXHIBIT 13**
BEER, ETAL v. XTO
Case No. CIC-07-98-L
**Page 1 of 5**
XTO 1066

followed by a written notification, and shall use its reasonable efforts to eliminate or remedy the disabling cause and restore performance.

(b) "Force majeure" means acts of God, strikes, lockouts or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, storms, floods, washouts, arrests and restraints of governments and people, civil disturbances, fires, explosions, breakage or accidents to machinery or lines of pipe, freezing of wells or lines of pipe, partial or entire failure of wells or sources of supply of gas, inability to obtain at reasonable cost servitudes, right of way grants, permits, governmental approvals, or licenses, inability to obtain at reasonable cost materials or supplies for constructing or maintaining facilities, and other causes, whether of the kind listed above or otherwise, not within the control of the party claiming suspension and which by the exercise of reasonable diligence the party is unable to prevent or overcome.

(c) **Labor Matters Exception.** The settlement of strikes or lockouts will be entirely within the discretion of the party having the difficulty, and settlement of strikes, lockouts, or other labor disturbances when that course is considered inadvisable is not required.

11. ASSIGNMENT. Either party may assign this Contract. This Contract is binding upon and inures to the benefit of the successors, assigns, heirs, personal representatives, and representatives in bankruptcy of the parties.

12. GOVERNING LAW. THIS CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OKLAHOMA, without reference to those that might refer to the laws of another jurisdiction.

13. FEES AND COSTS; DAMAGES. In the event of a breach, the parties are entitled to recover as their sole and exclusive damages for breach of the price and quantity obligations under this Contract the price for gas taken by Buyer in the case of Seller and the lost margin less avoided costs in the case of Buyer. If mediation or arbitration is necessary to resolve a dispute other than one arising under the indemnification obligations of this Contract, each party agrees to bear its own attorneys' fees and costs of investigation and defense, and each party waives any right to recover those fees and costs from the other party or parties.

14. MUTUAL WAIVER OF CERTAIN REMEDIES. Except as to the parties' indemnification obligations, NEITHER PARTY IS LIABLE OR OTHERWISE RESPONSIBLE TO THE OTHER FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, FOR LOST PRODUCTION, OR FOR PUNITIVE DAMAGES AS TO ANY ACTION OR OMISSION, WHETHER CHARACTERIZED AS A CONTRACT BREACH OR TORT, THAT ARISES OUT OF OR RELATES TO THIS CONTRACT OR ITS PERFORMANCE OR NONPERFORMANCE.

15. ARBITRATION. The parties desire to resolve any disputes that may arise informally, if possible. All disputes arising out of or relating to this Contract that are not resolved by agreement of the parties must be resolved using the provisions of this Section. To that end, if a dispute or disputes arise out of or relating to this Contract, a party shall give written notice of the disputes to the other involved parties, and each party will appoint an employee to negotiate with the other party concerning the disputes. If the disputes have not been resolved by negotiation within 30 days of the initial dispute notice, the disputes shall be resolved by arbitration in accordance with the then current Center for Public Resources ("CPR") Institute for Dispute Resolution Rules for Non-Administered Arbitration for the U.S. and Canada ("Rules") and this Section. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16, and the Rules, to the exclusion of any provision of state law inconsistent with them. The arbitration shall be initiated by a party seeking arbitration by written notice transmitted to the other party or parties to be involved. The parties shall select one disinterested arbitrator with at least ten years' experience in the natural gas industry or ten years' experience with natural gas law, and not previously employed by either party or its affiliates, and, if possible, shall be selected by agreement between the parties. If the parties cannot select an arbitrator by agreement within 15 days of the date of the notice of arbitration, a qualified arbitrator will be selected in accordance with the Rules. If the disputes involve an amount greater than $100,000, they will be decided by a panel of three arbitrators with the above qualifications, one selected by each party, and the third selected by the party-appointed arbitrators, or in the absence of their agreement, pursuant to the Rules. The arbitrator(s) shall resolve the disputes and render a final award in accordance with the substantive law of the state referenced in Section 13 above, "Governing Law." The arbitrator's award will be limited by the provisions set forth in Sections 14, "Fees and Costs; Damages" and 15 above, "Mutual Waiver of Certain Remedies." The parties intend case specific dispute resolution; either party may opt out of any attempted class action for all claims of any party related to this Contract. The arbitrator(s) shall set forth the reasons for the award in writing, and judgment on the arbitration award may be entered in any court having jurisdiction.

H:\Backup\Legal\DEFS Gas Forms\2004\Short Form Pur\Short Form Purchase Gen T&C 3-8-04.docd

CONFIDENTIAL

PUR S05 POI Short Form S TX 031804

EXHIBIT 13
BEER ETAL v XTO
Page 5 of 5
XTO 1067