# EXHIBIT 3

RECEIVED

APR 04 1996

GAS MARKETING

# GAS PURCHASE CONTRACT

dated as of March 29, 1996

between

## CROSS TIMBERS OIL COMPANY,
as Seller,

and

## TIMBERLAND GATHERING & PROCESSING COMPANY, INC.,
as Buyer

Lease of
Tyrone Gas Processing Plant and Related Gas Gathering Systems

CONFIDENTIAL

CONFIDENTIAL



PLAINTIFF'S
EXHIBIT
20

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1026

THIS GAS PURCHASE CONTRACT (this "Contract"), in entered into as of March 29, 1996, between CROSS TIMBERS OIL COMPANY, a Delaware corporation, hereinafter called "Seller", and TIMBERLAND GATHERING & PROCESSING COMPANY, INC., a Texas Corporation, hereinafter called "Buyer."

## W I T N E S S E T H:

WHEREAS, Seller holds interest in the lands, leases and leasehold working interests described on Exhibit A hereto (the "Leases"), including, without limitation, interests in and to the oil and gas wells described on Exhibit B hereto (the "Existing Wells"); and

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of Seller's interest in the gas produced from the Existing Wells and any additional oil and gas wells which may be drilled and completed on the Leases ("Future Wells," Existing Wells and Future Wells are collectively referred to herein as the "Wells").

NOW, THEREFORE, for and in consideration of the mutual covenants, benefits and agreements set forth herein, Buyer and Seller hereby agree as follows:

## ARTICLE I

## DEDICATION AND COMMITMENT

1.1   Subject to the terms and conditions hereof and the reservations of Seller under the this Contract, Seller dedicates to the performance of this Contract, during the term set forth in Article II below (the "Term"), all of Seller's rights, titles and interests ("Seller's Interests"), now existing or hereafter acquired, in and to the Leases, the Wells and all Gas (as defined herein) now or hereafter produced from or attributable to the Wells ("Seller's Gas").

1.2   Subject to the terms hereof, Seller agrees to tender all of Seller's Gas for delivery to Buyer at the Delivery Points (as defined herein).

1.3   Seller warrants and represents to Buyer, on a continuous basis throughout the Term, that (a) Seller has the right to market and sell Seller's Gas from each Well on its own behalf without the consent of other interest owners in the Wells, and (b) all Seller's Gas tendered and delivered under this Contract shall be free from any and all liens and adverse claims, including adverse claims for royalties, taxes, license fees or charges thereon accruing prior to delivery hereunder.

1

CONFIDENTIAL

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1027

1.4    Seller commits and agrees to act with due diligence in obtaining and installing all wellhead and other equipment for each Well required to effect delivery of Seller's Gas to Buyer at the Delivery Points. Seller shall promptly and diligently cause each such Well to be equipped, operated and maintained at all times in good working condition, in accordance with all applicable laws, rules and regulations, in accordance with all accepted industry standards, and without cost to Buyer. Seller agrees to install, operate and maintain, without cost to Buyer, a trap or separator, conventional mechanical single or multistage equipment, as may be necessary to separate liquids from the Gas prior to delivery to Buyer.

1.5    Seller and Buyer shall take no action, nor shall they suffer any action to be taken, with respect to Seller's Interest, Seller's Gas, or Buyer's facilities for gathering and processing the Gas that would, or could be reasonably be expected to, materially interfere with, encumber or adversely affect the unrestricted dedication and commitment of Seller's Interests to this Contract.

1.6    Nothing in this Agreement, nor any acts of the parties, shall be deemed or construed by the parties, or by any third party as creating the relationship of principal and agent or of partnership or joint venture between or among the parties.

## ARTICLE II

## DEFINITIONS

Except in those instances where the context expressly states another meaning, the following terms where used in this Contract, shall have the following meanings:

1.    "BTU" means British Thermal Unit.

2.    "Delivery Points" shall mean the point or points of delivery designated under Article IX, Section 2 of this Agreement.

3.    "Effective Date" shall be March 29, 1996.

4.    "Equipment Lease" means that certain Lease Agreement of even date herewith by and among Buyer and Wilmington Trust Company, a Delaware banking corporation, not in its individual capacity, but solely as "Owner Trustee."

5.    "Gas" means all elements, compounds and mixtures thereof contained in the effluent vapor stream produced from the Wells.



CONFIDENTIAL

BEER, ET AL. v XTO
Case No. CIV-07-798-L
XTO 1028

6.  "Gross Heating Value" means the number of BTUs in a cubic foot of gas at a temperature of sixty degrees (60°) Fahrenheit, saturated with water vapor, and at a pressure base of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute.

7.  "Month" means the period of time beginning at eight o'clock A.M., Central Time on the first day of a calendar month and ending at eight o'clock A.M. Central Time on the first day of next calendar month.

8.  "Tyrone Plant" means gas processing facility located in Section 11, T6N, R18ECM, Texas County, Oklahoma.

9.  "Weighted Average Residue Price", stated in dollars per million BTUs, means the total dollars received for residue Gas sold by Buyer at the tailgate of the Tyrone Plant during any month less the total dollars paid to others to transport such residue Gas, divided by the total BTUs of residue Gas, stated in millions of BTUs, sold during that same month.

10. "Year" means a period of twelve (12) months beginning on the date first written above or any anniversary of such day.

ARTICLE III

RESERVATIONS OF SELLER

Section 1.    Reservations

Seller reserves the right to use Gas for:

a)  The operation and development of Seller's interest in the Leases;

b)  Delivery to Seller's lessors under the Leases for use by such lessors to the extent required by the terms of such Leases; and

c)  Fuel in the operation of compression facilities which might need to be installed for the delivery of Gas hereunder.

3

CONFIDENTIAL

BEER, ET AL v. XTO
Case No. CIV-07-798-L
XTO 1029

## Section 2. Prior Deliveries

Seller reserves and excepts from the terms of this Contract Gas produced from the Wells delivered to others prior to the date of execution of this Contract by both Seller and Buyer.

## Section 3. Liquid Hydrocarbons.

All liquid hydrocarbons, oil or condensate removed by Seller by means of drips or conventional mechanical field separators ("Liquids") shall be reserved to Seller. It is understood and agreed, however, except for Liquids extracted by Seller under the preceding sentence, Buyer shall have the exclusive right to process, or to cause the processing of, all Gas produced from the Leases for the extraction of ethane, propane, butanes, pentanes and heavier hydrocarbons.

## ARTICLE IV
## QUANTITY OF GAS

## Section 1. Contract Quantities

Subject to the provisions of this Contract, during the term of this Contract, Seller agrees to tender for delivery hereunder at the Delivery Points, and Buyer agrees to receive and purchase at the Delivery Points, all Gas produced or to be produced by or for the account of Seller from the Wells. Buyer agrees to take Gas from the Wells covered by this Contract in the same rateable manner that it takes Gas from other wells from which Buyer takes Gas in the same reservoir; provided, however, that Buyer shall not be obligated to purchase Gas hereunder in excess of Buyer's market requirements. Buyer shall have the right to suspend the purchase of Gas under this Contract during periods of routine and emergency maintenance of Buyer's facilities.

## ARTICLE V
## PRICES AND TAXES

## Section 1. Price

Subject to the other provisions hereof, the price to be paid by Buyer to Seller for each one thousand (1,000) cubic feet of Gas delivered to Buyer shall be eighty percent (80%) of the Weighted Average Residue Price; provided, that in the event the Gross Heating Value of the Gas purchased from any Well hereunder is more or less than one thousand (1,000) BTUs per cubic foot, then the price payable for Gas from such Well shall be adjusted. Such adjusted price shall be determined by multiplying the price payable, pursuant to the provisions of this Article V, by a fraction, the numerator of which is the Gross Heating Value of the Gas purchased, expressed in BTUs per cubic foot, and the denominator of which is one thousand (1,000).

4

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1030

Section 2.   Renegotiation.

Either Seller or Buyer may request a renegotiation of the price to be paid hereunder effective for Gas delivered on and after March 31, 2001, and on and after March 31 of each year thereafter; provided, that Seller and Buyer may enter into a written agreement (a "Renegotiation Deferral Agreement") pursuant to each of which Buyer and Seller agree to extend by one (1) year the earliest date on which each party has the right to renegotiate the price to be paid for Gas purchased hereunder.  Written notice by either party to the other shall be required to invoke the renegotiation procedure provided for hereunder and must be delivered to Seller or Buyer, as the case may be, not more than one hundred twenty (120) nor less than sixty (60) days prior to the commencement of the period for which such renegotiated price is to be effective.  Such written notice shall set out the price level which such party proposes.  The parties shall attempt to agree upon the reasonable market price for Gas to be in effect during the applicable twelve (12) month period, taking into consideration the location of the Gas, the term for which the price is to apply, the quantity of the reserves attributable thereto, the average daily takes of Gas, the quality of the Gas, terms and conditions of delivery, and all other matters and factors affecting the price of the Gas, including Buyer's markets, alternative fuel and/or competitive gas costs within those markets, tax reimbursement and applicable transmission and distribution rates to deliver the Gas to Buyer's markets.  If the parties are unable to renegotiate and agree upon such reasonable market price, taking into consideration the above-mentioned factors and circumstances then in effect, then such renegotiation shall be referred to arbitration in accordance with Article XIV hereof and the arbitrators, by the use of the above-mentioned standards, shall arrive at a reasonable market price to be effective during the period in question.  The price determined under this Section shall become effective at the commencement of the period for which the same was renegotiated or arbitrated and shall be applicable throughout such period and until a subsequent renegotiated or arbitrated price becomes effective, subject however, to the other provisions of this Contract.

Notwithstanding any other provision of this Contract, it is further agreed that the price paid for Gas hereunder will not exceed the maximum lawful price under any valid law or regulations applicable hereto.

Section 3.   Nonregulated Gas

The parties expressly agree that this Contract shall be considered a new Contract for the purposes of the Natural Gas Wellhead Decontrol Act of 1989.  As such, the Gas to be produced from the Wells shall not be subject to any maximum lawful price under the Natural Gas Policy Act nor be subject to the jurisdiction of the Federal Energy Regulatory Commission.

CONFIDENTIAL

BEER, ETAL v XTO
Case No. CIV-07-798-L
XTO 1031

Section 4.  Taxes

Seller shall bear and pay or cause to be paid, all taxes imposed upon Seller with respect to the Gas delivered hereunder, and Buyer shall bear and pay taxes imposed upon Buyer with respect to the Gas after delivery thereof to Buyer.

If required by law, Buyer will remit payment of such taxes to the proper authority and deduct Seller's portion thereof from Buyer's payment to Seller.

## ARTICLE VI

## PAYMENT

Section 1.  Payment

Buyer shall remit to Seller all sums due for Gas purchased by Buyer during each month, by the twenty-fifth (25th) day of the next succeeding month.

Section 2.  Disbursement

Seller shall be solely responsible for disbursing all proceeds due the working interest owners and any other third parties, including royalty, overriding royalty and production payments. Seller shall furnish Buyer a One Hundred Percent (100%) indemnifying division order.

## ARTICLE VII

## MEASUREMENT OF GAS

Section 1.  Unit of Measurement

The unit of volume for purposes of measurements shall be one (1) cubic foot of Gas at a temperature base of sixty degrees (60°) Fahrenheit and at a pressure base of fourteen and sixty-five (14.65) pounds per square inch absolute.

Section 2.  Method of Measurement

All measuring equipment, devices, and materials, required in this Article shall be furnished by Buyer at Buyer's expense.  Buyer shall install, maintain and operate the facilities at Buyer's expense.  Seller may install and operate check measuring equipment provided it does not interfere with the use of Buyer's equipment in determining the volumes of Gas delivered by Seller to Buyer at the point of delivery. The following practices shall prevail:

6

CONFIDENTIAL

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1032

a) Metering and Computation of Volume. The volume shall be measured and computations made as prescribed in ANSI/API 2530 Measurement Standards (formerly American Gas Association Report No. 3) or any subsequent revisions hereto. For the purposes of measurement and meter calibration, the atmospheric pressure shall be assumed to be thirteen and two-tenths (13.2) pounds per square inch, irrespective of variations in natural atmospheric pressure from time to time.

b) Specific Gravity. Specific gravity shall be determined with accuracy to the nearest one thousandth by taking samples of the Gas at the measurement point at such times as may be determined by Buyer but not less frequently than once each six (6) months, and by having the specific gravity determined by the use of an instrument commonly used and accepted in the industry.

c) Temperature. The temperature of the Gas flowing through each meter is assumed and agreed to be sixty degrees (60°) Fahrenheit; provided, however, that Buyer may at any time install a recording thermometer to record the temperature of the Gas flowing through the meter, in which event the arithmetic average of the hourly temperatures recorded shall thereafter be used in correcting the volumes delivered hereunder to the unit of measurement specified in Section 1 of this ARTICLE VI.

d) B.T.U. Commencing with initial production, the Gross Heating Value of the Gas delivered at the delivery point shall be computed from tests of such Gas, made by Buyer as frequently as deemed necessary but not less frequently than once each month until the Gross Heating Value has stabilized; thereafter, as often as deemed necessary but not less frequently than once each six (6) months. Representative samples of Gas shall be procured under pressure in steel bottles or tanks and the heating value thereof determined by passing the Gas through an accurately calibrated Cutler Hammer calorimeter employing the Thomas Principle of Calorimetry as described in Research Paper No. 519, published by U.S. Department of Commerce. The heating value of the Gas from such well shall be deemed to remain constant until the next test.

Buyer may elect to determine heating value by gas chromatography. In that event, the Gross Heating Value shall be determined in accordance with GPA Publication 2172-84 (latest revision), shall utilize a chromatographic analysis of the Gas which has been determined in compliance with GPA Publication 2261-72 (latest revision) and shall be corrected to the temperature, pressure and water content specified herein.

7

CONFIDENTIAL

BEER, ETAL v. XTO
Case No. CIV-07-798-L
XTO 1033

Section 3.  Equipment Testing

The accuracy of Buyer's measuring equipment shall be verified by test not less frequently than once each three (3) months, using means and methods generally acceptable in the gas industry. Measuring equipment found to be registering inaccurately shall be adjusted to read as accurately as possible.

Section 4.  Measuring Equipment Out Of Repair

If for any reason any measuring equipment is inoperative or inaccurate so that the volume of Gas delivered is not correctly indicated by the reading thereof, and if such reading is in error by more than two percent (2%) in the measurement of Gas, then the volumes of Gas delivered during the period such measuring equipment is inoperative or inaccurate shall be determined by the parties hereto on the basis of the best data available using the first of the following methods which is feasible:

a)   By using the registration of any check measuring equipment installed and accurately registering;

b)   By correcting the error if the percentage of error is ascertainable by calibration, test or mathematical calculations; or

c)   By comparing deliveries made during preceding periods under similar delivery conditions when meter was registering accurately.

An adjustment based on such determination shall be made for such period of inaccuracy as may be definitely known, or if not known, then for one-half the period since the date of the last meter test. In no event, however, shall any adjustment extend back beyond three (3) months from the date the error was first made known by one party hereunder to the other.

Section 5.  Inspection of Equipment

Buyer and Seller shall have the right to inspect equipment installed or furnished by the other party, and the charts and other measurement of test data of the other party, at all times during normal business hours; but the reading, calibration and adjustment of Buyer's equipment and changing of charts on Buyer's meter shall be done only by the Buyer. Buyer and Seller shall preserve all original test data, charts and other similar records in such party's possession for a period of at least two (2) years.



CONFIDENTIAL

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1034

Section 1. Quality Specifications.

The Gas delivered hereunder at the Delivery Points shall be commercially free of gum, gum-forming constituents, solid and/or liquid matter that may become separated from the Gas during transportation thereof and shall conform to the following specifications:

a) Dust, rust and other solids     None
b) Carbon Dioxide     Not more than 2.0% by volume
c) Oxygen     Not more than 2/10 of 1% by volume
d) Hydrogen Sulfide     Not more than 1/4 grain per 100 cubic feet
e) Total Sulphur     Not more than 20 grains per 100 cubic feet
f) Free Water     None
g) Temperature     Not more than 120° F

Section 2. Sub-Quality Gas

Buyer, at its option, may refuse to accept delivery of any Gas not meeting the quality specifications set out in this ARTICLE VII. If Seller does not conform the Gas to said specifications, then Buyer may accept Gas tendered by Seller hereunder which does not meet the specifications above, treat same to conform to said specifications and charge Seller a reasonable fee therefor. If neither Buyer nor Seller elects to treat the Gas to conform to the above specifications, then Buyer shall upon ninety (90) days prior written notice from Seller, release from the provisions of this Contract the Production Unit from which such Gas is produced but only with respect to those zones for formations producing sub-quality Gas.

Seller shall not induce into Gas delivered any corrosion inhibitors, chemicals, antifreeze agents or other materials containing constituents harmful or injurious to Buyer's operation.

ARTICLE IX

DELIVERY PRESSURE AND DELIVERY

Section 1. Delivery Pressure

Delivery of Gas hereunder shall be made at a pressure that is sufficient to effect delivery of the Gas into Buyer's gathering lines against the pressure prevailing therein, provided, that the pressures in Buyer's gathering lines shall not exceed 100 pounds per square inch.

9

CONFIDENTIAL

If Seller's Well(s) are incapable of delivering Gas into Buyer's gathering lines against the pressure prevailing therein when same is maintained in accordance with the provisions hereof, and neither Seller nor Buyer elect to compress Gas in order to effect delivery of Gas into Buyer's gathering system, Buyer, upon the written request of Seller, shall release from the provisions of this Contract any Well(s) where Gas produced is incapable of being delivered into Buyer's gathering system. However, if Seller does not elect to compress, and Buyer elects to compress, Buyer may reduce the price otherwise payable by an amount which allows Buyer to recover compression expenses plus a reasonable return on invested capital.

If either party installs compression facilities, then such party agrees to provide sufficient pulsation dampening equipment so that measurement at the point of delivery will not be affected by pulsation.

Section 2 Delivery Point

Delivery of Gas hereunder from Seller's Wells shall be at Buyer's meter to be located at a mutually agreeable point on Buyer's gathering system. Title to Gas shall pass at the point of delivery, and Seller shall be solely liable for all loss of said Gas or damage or injury caused thereby until title has passed to Buyer. Buyer shall be obligated to maintain connection only if, in Buyer's sole judgement, it remains economical to do so.

## ARTICLE X

## TITLE TO GAS

Seller warrants title to all Gas delivered to Buyer irrespective of Seller's interest in the Gas, produced from the Wells, and that Seller has authority to sell the same, and Seller agrees to indemnify and save Buyer harmless from any and all suits, claims, and liens of whatsoever nature relating to such Gas or the title thereto. If the title thereto shall at any time be questioned or involved in litigation, Buyer shall have the right to withhold (without interest) the proceeds payable for the Gas produced from the particular property in litigation or dispute during the period of such litigation or until said title is freed from such question, or until Seller shall furnish a bond, in form and with sureties acceptable to Buyer harmless.

If there is a defect in Seller's title, Seller shall, with reasonable promptness, attempt to remedy such defect. Until the defect to such title shall have been remedied, Buyer shall have the right either to refuse to accept deliveries of Gas hereunder for such reason, or to accept deliveries of Gas hereunder and withhold (without interest) the proceeds otherwise payable to Seller hereunder.



CONFIDENTIAL

BEER, ETAL v XTO
Case No. CIV-07-798-L
XTO 1036

Seller agrees, upon the request of Buyer, to furnish for examination all abstracts of title available to Seller and any other title information pertaining to the Wells which Seller has available.

## ARTICLE XI

## FORCE MAJEURE

In the event of either party hereto being rendered unable, wholly or in part, by force majeure to carry out its obligations under this Contract, other than to make payments due hereunder, it is agreed that on such party giving notice and full particulars of such force majeure in writing or by facsimile to the other party as soon as possible after the occurrence of the cause relied on, the obligations of the party giving such notice as far as they are affected by such force majeure, shall be suspended during the continuance of any inability so caused but for no longer period, and such cause shall as far as possible be remedied with all reasonable dispatch. The term "force majeure" as employed herein shall mean acts of God, governmental action, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, hurricanes, tornadoes, storms, storm warnings, floods, washouts, arrests and restraints of governments and people, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, the necessity for making repairs to or alteration of wells or sources of supply of Gas, and any other cases, whether of the kind herein enumerated or otherwise, not within the control of the party claiming suspension and which by the exercise of due diligence such party is unable to prevent or overcome; such term shall likewise include (a) in those instances where either party hereto is required to obtain servitudes, rights-of-way grants, permits or licenses to enable such party to fulfill its obligations hereunder, the inability of such party to acquire, or the delays on the part of such party in acquiring, at reasonable cost and after the exercise of reasonable diligence, such servitudes, rights-of-way grants, permits or licenses, and (b) in those instances where either party hereto is required to furnish materials and supplies for the purpose of construction or maintaining facilities or is required to secure permits or permission from any governmental agency to enable such party to fulfill its obligations hereunder, the inability of such party to acquire, or the delays on the part of such party in acquiring, at reasonable cost and after the exercise of reasonable diligence, such materials and supplies, permits and permissions; such term shall likewise include the failure or inability of Buyer to process Gas at the Tyrone Plant or the inability or refusal of Buyer's residue gas purchaser or transporter to take such Gas or the inability of Buyer to market residue gas or any other reason not cause by Buyer. It is understood and agreed that the settlement of strikes or lockouts shall be entirely within the discretion of the party having the difficulty, and that the above requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of any opposing party when such course is inadvisable in the discretion of the party having the difficulty.

11

CONFIDENTIAL

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1037

# ARTICLE XII

## DEFAULT

If either party hereto shall fail to perform any of the covenants or obligations imposed upon it under and by virtue of this Contract the other party may at its option, in addition to all other remedies available at law or equity, terminate this Contract by proceeding as follows: The party not in default shall cause a written notice to be served on the party in default, stating specifically the cause for terminating this Contract and declaring it to be the intention of the party giving the notice to terminate the same; whereupon the party in default shall have thirty (30) days after the service of the aforesaid notice in which to commence to remedy or remove the cause or causes stated in the notice for terminating the Contract, and if, within a period of ninety (90) days, the party in default does so remedy or remove said cause or causes and fully indemnifies the party not in default for any and all consequences of such breach, then such notice shall be withdrawn and this Contract shall continue in full force and effect. In case the party in default does not so remedy or remove the cause or causes or does not indemnify the party giving the notice for any and all consequences of such breach within said period of ninety (90) days, this Contract, at the option of the party giving notice, shall become null and void from and after the expiration of said period. Any termination of this Contract pursuant to the provisions of this ARTICLE XII or ARTICLE XIII shall be without prejudice to the right of Seller to collect any amounts then due Seller for Gas delivered prior to the time of termination and shall be without prejudice to the right of Buyer to receive any Gas for which it has paid but has not received, although entitled thereto, prior to the time of termination, and without waiver or prejudice of any remedy to which the party not in default may be entitled for violations of this Contract.

## ARTICLE XIII

## TERM

This Contract shall be in effect during the period commencing on the date hereof and ending on the eighth (8th) anniversary of the date hereof, provided, however, that this Contract shall not expire on such date and shall instead continue until (a) the tenth (10th) anniversary of the date hereof if, the Equipment Lease is renewed for the First Renewal Term (as defined in the Equipment Lease) and at the expiration thereof no Default or Event of Default (as defined in the Equipment Lease) has occurred which is continuing, (b) the fifteenth (15th) anniversary of the date hereof if, at any time during the Basic Term (as defined in the Equipment Lease) or the First Renewal Term of the Equipment Lease, an Event of Default occurs under and as defined in the Equipment Lease and as a result thereof, Owner Trustee requires Buyer to deliver possession of the Assets subject to the Equipment Lease to Owner Trustee, or Owner Trustee otherwise retakes possession of the Assets, or (c) March 31, 2026 if, at the expiration of the Basic Term (as defined in the Equipment Lease) of the Equipment Lease, Owner Trustee delivers the offer notice

12

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1038

pursuant to Section 5.2(g)(i) of the Participation Agreement and at the expiration of the Basic Term of the Equipment Lease, Lessee does not purchase the Assets pursuant to such offer notice or renew the Equipment Lease for the first Renewal Term (as defined in the Equipment Lease). In the event that, due to depletion, Gas from a Well or Wells cannot be produced and delivered in sufficient quantities to be commercial to either Buyer or Seller, then Buyer or Seller may partially terminate this Contract with respect to such Well(s). In the event that processing plant operations at the Tyrone Plant are permanently discontinued, Buyer may terminate this Contract on sixty (60) days prior written notice. In either such event the parties hereto shall, with reasonable promptness, execute a release evidencing such termination.

ARBITRATION

Any dispute arising between Seller and Buyer under Article V, Section 2 of this Contract shall be determined by a board of three (3) arbitrators to be selected for each such controversy so arising as follows:

(a)   Any controversy between the parties hereto and not resolved by agreement shall be determined by a board of arbitration upon notice of submission given by either party to the other, which notice shall name a qualified, independent arbitrator. Within ten (10) days after the receipt of such notice, the other party shall name a qualified, independent arbitrator, or failing to do so, the party giving notice shall name the second. The two arbitrators so appointed shall name the third qualified, independent arbitrator, or failing to do so, the third arbitrator may be appointed by the Senior Judge (in service) of the United States District Court for the Northern District of Texas.

(b)   The arbitrators selected to act hereunder shall be qualified by education and experience to pass on the particular question in dispute. The arbitrators shall promptly hear and determine (after due notice of hearing and giving the parties a reasonable opportunity to be heard) the questions submitted, and shall render their decision within sixty days after appointment of the third arbitrator. If within said period a decision is not rendered by the board, or majority thereof, new arbitrators may be named and shall act hereunder at the election of either Buyer or Seller in like manner, as if none had been previously named.

(c)   The board shall have jurisdiction solely to determine the price to be established for the period in question under the provisions of Article V, Section 2 of this Contract. The decision of the arbitrators, or the majority thereof, made in writing shall be final and binding upon the parties hereto as to the questions submitted, and Buyer and Seller will abide by and comply with such decision. The expenses of arbitration, including reasonable compensation to the arbitrators,


CONFIDENTIAL
BEER, ET AL. v. XTO
Case No. CIV-07-98-L
XTO 1039

shall be borne equally by the parties hereto, except that each party shall bear the compensation and expenses of its own counsel, witnesses, and employees.

## ARTICLE XV

## MISCELLANEOUS

Section 1.    Notices

All notices, requests and other communications to Seller or Buyer hereunder shall be in writing (including bank wire, telecopy or similar writing) and shall be given to such party at its address, telex or telecopy number set forth on the signature pages hereof or such other address, telex or telecopy number as such party may hereafter specify for such purpose by notice to the other party. Each such notice, request or other communication shall be effective (a) if given by telecopy, when such telecopy is transmitted to the telecopy number specified in this Section 1 of Article XV and the appropriate answerback is received or receipt is otherwise confirmed, (b) if given by mail, one (1) business day after deposit in the mails with first class postage prepaid, addressed as aforesaid, or (c) if given by any other means when delivered at the address specified in this Section 1 of Article XV.

Section 2.    Regulatory Jurisdiction

This Contract is subject to all valid legislation, both State and Federal, and to all valid present and future orders, rules and regulations of duly constituted authorities having jurisdiction.

Section 3.    Assignment

This Contract shall bind and inure to the benefit of the parties hereto, their successors and assigns. Buyer shall not be considered as notified of any transfer by Seller of any Well(s) until Buyer shall have been furnished with original or a copy of the recorded assignment evidencing such transfer or an abstract of title showing such transfer of interest. The Effective Date of such transfer shall be considered to be the first day of the month following the day Buyer received such evidence of the transfer.

Section 4.    Easements

Seller hereby grants and assigns to Buyer all requisite easements and rights-of-way over, across and under any land that Seller has the right so to do, and right to perform thereon any acts necessary or convenient for carrying out the terms of this Contract and Buyer's obligations hereunder.

14


CONFIDENTIAL

BEER, ETAL v. XTO
Case No. CIV-07-798-L
XTO 1040

Section 5.    Entirety

This Contract contains the entire agreement between the parties and there are no oral promises, agreements or warranties affecting it.

Section 6.    Governing Law

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF OKLAHOMA WITHOUT REFERENCE TO THE CHOICE OF LAW DOCTRINE OF SUCH STATE.

Executed on the date first written above.

"Buyer"

TIMBERLAND GATHERING & PROCESSING
COMPANY, INC.

By: _____
    Louis G. Baldwin
    Vice President and Treasurer

Notice:

810 Houston Street, Suite 2000
Fort Worth, Texas 76102
Fax: (817) 870-1671

"Seller"

CROSS TIMBERS OIL COMPANY

By: _____
    John M. O'Rear
    Vice President and Treasurer

Notice:

810 Houston Street, Suite 2000
Fort Worth, Texas 76102
Fax: (817) 870-1671

Payment:

Post Office Box 840287
Dallas, Texas 75825

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1041

# EXHIBIT A

## Description of Leases

16

CONFID

BEER, ETAL v. XTO
Case No. CIV-07-798-L
XTO 1042

# EXHIBIT B

## Description of Wells

17

CONFIDENTIAL

BEER, ET AL v. XTO
Case No. CIV-07-798-L
XTO 1043

| METER NUMBER | LEASE NAME/NUMBER |
|---|---|
| 125 | BAKER, ELMER 1 |
| 135 | BALZER, AV 1 |
| 140 | BALZER, J V 2-A |
| 145 | BALZER, JV 1 |
| 150 | BALZER, JV 2 |
| 160 | BAUGHMAN, JOHN W 1 |
| 165 | BAXTER, EVA J 1 |
| 170 | BEASLEY, J S 1 |
| 185 | BECKER, H H 1 |
| 190 | BECKER, H H 2 |
| 205 | BEVAN, LILA 1 |
| 250 | BOLES, ALLIE 1 |
| 255 | BOLES, ALLIE 2 |
| 260 | BOLES, ERNEST P. 1 |
| 265 | BOLES, ERNEST P. 2 |
| 270 | BOLES, FRANK G. 1 |
| 275 | BOLES, FRANK G. 2 |
| 280 | BOLLINGER, CORRA BELLE 1 |
| 290 | BOYCE, GOLDIE UNIT 1 |
| 300 | BROWN, H.W. 1 |
| 305 | BRUCE 1-12 |
| 320 | BURNETT, JOHN 1 |
| 325 | BURNETT, JOHN 2 |
| 335 | CAIN, GLENN 2 |
| 340 | CARPENTER , E L 1 |
| 345 | CARR 5-1 |
| 350 | CHRSPENS, J.F. EST 1 |
| 360 | CLANCY, J J 1 |
| 385 | COMPTON, DILLARD 1 |
| 390 | COMPTON, MATILDA 1 |
| 415 | CRAMER, C L 1 |

CONFIDENTIAL

BEER, ETAL v. XTO
Case No. CIV-07-798-L
XTO 1044

| METER NUMBER | LEASE NAME/NUMBER |
|---|---|
| 420 | CURTIS, DAVID 1 |
| 425 | CURTIS, JENNIE 1 |
| 440 | DECAMP, W 1 |
| 445 | DECAMP, W 2 |
| 500 | DOWDY, O F 1 |
| 505 | DOWDY, O F 2 |
| 510 | DOWDY, O F 3 |
| 515 | DOWDY, O F 4 |
| 520 | DOWDY, O F 5 |
| 525 | DOWDY, O F 6 |
| 530 | DOWDY, O F 7 |
| 535 | DOWDY, O F 8 |
| 540 | DUBOIS GOLDIE 1 |
| 545 | DUBOIS GOLDIE 2 |
| 550 | DUER, H.C. 1 |
| 555 | DUNCAN, FLORENCE 1A |
| 570 | DUNLAP, H H 1 |
| 575 | DUNLAP, H H 2 |
| 580 | EHRHARDT 1 |
| 605 | ELMORE, J W 1 |
| 610 | ELMORE, J W 2A |
| 615 | ELMORE, J W 3 |
| 625 | ENGEL, BLANCHE 2 |
| 630 | ENGEL, BLANCHE 1 |
| 631 | ENGEL, JACK #1 |
| 635 | ENNS, D H 1 |
| 640 | ENNS, HENRY H 1 |
| 640 | ENNS, HENRY H 1 |
| 645 | ENZ BROTHERS 1 |
| 650 | ENZ, GEORGE 1 |
| 655 | FANKHOUSER, ETHEL ETAL 1 |

CONFIDENTIAL

| METER NUMBER | LEASE NAME/NUMBER |
|---|---|
| 885 | HAGAMAN, M 2 |
| 900 | HAMPSTEN , HENRIETTA 1 |
| 910 | HAMPTON, E D 1 |
| 915 | HAMPTON, E D 2 |
| 920 | HANSEN, JAMES F 1 |
| 925 | HARMS, WALTER 5-1 |
| 930 | HARMS, WALTER 1-K |
| 935 | HARMS, WALTER 2-K |
| 936 | HARRISON, RUBY 1-8 |
| 937 | HARRISON, RUBY 2-8 |
| 955 | HERSHEY, E 1 |
| 955 | HERSHEY, E 1 |
| 960 | HIEBERT D A 1-A |
| 970 | HILBIG, A L 1 |
| 975 | HILBIG, A L 2 |
| 980 | HILL, A J 1 |
| 985 | HOEME, FRED W 1 |
| 990 | HOEME, OTTO 1 |
| 995 | HOEME, RICHARD 1 |
| 995 | HOEME, RICHARD 1 |
| 1000 | HOEME, ROLAND ETAL 1 |
| 1005 | HOFFERBER , JOHN 1 |
| 1010 | HOFFERBER , JOHN 2 |
| 1010 | HOFFERBER , JOHN 2 |
| 1015 | HONEMAN F HEIRS 1 |
| 1025 | HOOD , L O 1 |
| 1026 | HOOD, M 2-5 |
| 1030 | HOPKINS , E O 1 |
| 1075 | HUGHEY, ALBERT ESTATE 1 |
| 1080 | HUMBLE, FRANK 1 |
| 1085 | IMBLER BROTHERS 1 |

CONFIDENTIAL

BEER, ETAL v. XTO
Case No. CIV-07'798-L
XTO 1046

| METER NUMBER | LEASE NAME/NUMBER |
|---|---|
| 1090 | IMBLER BROTHERS 2 |
| 1105 | JANZEN, CORNELIUS 1 |
| 1110 | JONES, S S 1 |
| 1115 | KASER, V. 1 |
| 1130 | KILLINGSWORTH 1 |
| 1140 | KINSINGER 1 |
| 1145 | KLASSEN 1 |
| 1150 | KNOP, CARRIE 1-A |
| 1155 | KNOP, CARRIE 2-A |
| 1170 | LASSWELL , ELLAVEDA 1 |
| 1173 | LEE, B.L. 1-9 |
| 1190 | LUNDGRIN, GEORGE 1-A |
| 1195 | LUTES, 1 H 1 |
| 1200 | LUTES, OTTO 1 |
| 1210 | LYNCH, PAULINE 1 |
| 1230 | MAHONEY, ALENE 1 |
| 1235 | MAHONEY, ALENE 2 |
| 1240 | MALICOAT, J F 1 |
| 1245 | MAPP, PAULINE 1 |
| 1265 | MASSA , MITCHELL 1 |
| 1280 | MAYER, NANNIE 1 |
| 1285 | MAYER, R H 1 |
| 1295 | MCGUIRE THOMAS J 1 |
| 1300 | MCKIRAHAN, FRANK 1 |
| 1305 | MCKIRAHAN, H P 1 |
| 1310 | MCLAUGHLIN D 1 |
| 1315 | MEARS, GUY D 1 |
| 1320 | METCALF, THOMAS J 1 |
| 1325 | MILLER, C R 1 |
| 1330 | MILLER, C R 2 |
| 1335 | MITCH 1 |

CONFIDENTIAL

| METER NUMBER | LEASE NAME/NUMBER |
| --- | --- |
| 1355 | MONO CORPORATION 1-A |
| 1360 | MONO CORPORATION 2 |
| 1380 | MUELLER, ALBERTA 1 |
| 1385 | MUELLER, ALBERTA 2 |
| 1390 | NASH, CHESTER 1 |
| 1395 | NEFF, BOSS IRA 1 |
| 1405 | NIX, CLARENCE 2 |
| 1410 | NIX, CLARENCE ET AL 1 |
| 1415 | NOEL, ALICE 1 |
| 1420 | NORTON, A M 1 |
| 1450 | PAGE, SUSAN 1 |
| 1455 | PARHAM, LILLIE C 1-A |
| 1460 | PARKES, FERN 1 |
| 1465 | PARKES, FRANK 1 |
| 1480 | PAULS, MARGARET 1 |
| 1500 | PETROWSKY, H C 1 |
| 1505 | PHILPOTT, CORA 1 |
| 1510 | PIPKIN, J L 1 |
| 1520 | PRICHARD 1 |
| 1530 | RAINES, GEORGE M 1 |
| 1535 | RAINES, GEORGE M 2 |
| 1540 | RAWLINS, FRED 1 |
| 1545 | REAZIN, NINA 1 |
| 1550 | REISWIG, DANIEL EST 1 |
| 1555 | REISWIG, FRED EST 1 |
| 1575 | RODGERS, N T 1 |
| 1575 | RODGERS, N T 1 |
| 1580 | ROGERS, J P 1 |
| 1585 | ROGERS, J P 2 |
| 1595 | ROGERS, J P 4 |
| 1605 | ROTH, E W 1 |

# TIMBERLAND GA...RING & PROCESSING COMPANY, INC.

| METER NUMBER | LEASE NAME/NUMBER |
| --- | --- |
| 665 | FARLEY, J J 1 |
| 670 | FARLEY, J J 2 |
| 675 | FAST, A F 1 |
| 675 | FAST, A F 1 |
| 680 | FAST, SARAH 1-A |
| 700 | FERK, VIRTUS J. 1 |
| 700 | FERK, VIRTUS J. 1 |
| 705 | FERK, VIRTUS J. 1 |
| 705 | FINCHAM, A E 1 |
| 710 | FINICUM, CLARA 1 |
| 710 | FINICUM, CLARA 1 |
| 725 | FRIESEN , JACOB E 1 |
| 730 | FRITZLER, HENRY 1 |
| 735 | GALLIART, M. 1 |
| 735 | GALLIART, M. 1 |
| 745 | GAMMELL, D T 1 |
| 750 | GAMMELL, D T 2 |
| 755 | GANTT, JOHN W EST 1 |
| 770 | GARTUNG, OTTO 1 |
| 780 | GIESELMANN, AUGUST 1 |
| 805 | GRANT, ROY F 1 |
| 810 | GRANT, ROY F 3 |
| 815 | GRANT, ROY F 2-A |
| 820 | GRANT, ROY F-4-A |
| 840 | GREEN, W R 1 |
| 845 | GREEN, W R 2 |
| 850 | GRIZZELL, MARY 1 |
| 855 | GROSS, OTIS F 1 |
| 865 | HACKENBER, GEORGE 1 |
| 870 | HACKER, J T 1 |
| 875 | HACKER, J T 2 |
| 880 | HAGAMAN, M 1 |

CONFIDENTIAL

TIMBERLAND GATHERING & PROCESSING COMPANY, INC.

| METER NUMBER | LEASE NAME/NUMBER |
|---|---|
| 1610 | SAFRANKO, S D 1 |
| 1610 | SAFRANKO, S D 1 |
| 1625 | SCHNACKENBERG 1 |
| 1650 | SHIVES, J L 1 |
| 1655 | SHIVES, L M 1 |
| 1680 | SPEAKMAN , GUY 1 |
| 1685 | SPEAKMAN , GUY 2 |
| 1705 | STANFORD, ANNA B 1 |
| 1710 | STATE 1 |
| 1715 | STEINKEUHLER , CHARLES 1 |
| 1725 | STEPHENS , THELMA 1 |
| 1730 | STEPHENS , THELMA 2 |
| 1735 | STOLL , BI |
| 1740 | STREETER 1-15 |
| 1775 | SYLVESTER , LAWRENCE 1 |
| 1780 | TARRANT 1 |
| 1785 | TATUM, KATE 1 |
| 1790 | TAYLOR VERNON F 1 |
| 1795 | TAYLOR VERNON F 2 |
| 1800 | TAYLOR VERNON F 3 |
| 1805 | TAYLOR VERNON F 4 |
| 1810 | TAYLOR VERNON F 5 |
| 1815 | TOWNER , ROY M 1 |
| 1825 | TUCKER , H V 1 |
| 1830 | TUCKER , H V 2 |
| 1840 | UKENS , WESLEY 1 |
| 1850 | VANDERWORK 2 |
| 1860 | VOILES , C B 1 |
| 1880 | WALL, PERRY 1 |
| 1885 | WALL, PERRY 2 |
| 1890 | WALL, PERRY 3 |

CONFIDENTIAL

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1050

TIMBERLAND GATHERING & PROCESSING COMPANY, INC.

| METER NUMBER | LEASE NAME/NUMBER |
| --- | --- |
| 1895 | WALL, PERRY 4A |
| 1900 | WALL, PERRY 5 |
| 1920 | WHITE, A W 1 |
| 1925 | WHITE, S W 1 |
| 1930 | WIGGAINS 1 |
| 1945 | WILSON , RUTH 1 |
| 1970 | WINTER 1 |
| 1975 | WIRSIG, H H 1 |
| 1990 | WOODS, LEONA 1 |
| 1995 | WOODWARD, ERNEST 1 |
| 2005 | YAUCK, K. 1 |

CONFIDENTIAL

BEER, ETAL v XTO
Case No CIV-07-198-L
XTO 1051

# RATIFICATION AND AMENDMENT TO GAS PURCHASE CONTRACT

This Amendment to Gas Purchase Contract ("Amendment") is entered into this 28th day of January, 2006, by and between XTO Energy Inc., a Delaware corporation ("XTO"), and Timberland Gathering & Processing Company, Inc., a Texas corporation("Timberland"), collectively referred to as "Parties", and individually referred to as "Party".

## RECITALS

A. On March 29, 1996, Cross Timbers Oil Company ("Cross Timbers"), as Seller, and Timberland, as Buyer, entered into that certain Gas Purchase Contract ("Contract"), covering lands described therein.

B. In 2001, Cross Timbers changed its name to XTO.

C. The parties wish to amend the Contract to replace Cross Timbers with XTO in all respects.

D. The parties hereto wish to amend the "Term" section of the Contract to be extended on a year to year basis.

E. The parties hereto wish to amend the terms of the "Notice" section of the Contract to include XTO.

NOW, THEREFORE, for and in consideration of the mutual agreements and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. In the address for Article XV, Section I. Notices, the following address shall be added:

   Seller:
   XTO Energy Inc.
   810 Houston St.
   Fort Worth, TX 76102-6298

2. In Article XIII, Term, the following shall be added:

   a. Upon expiration of the Contract hereunder, the Term of this Contract shall continue uninterrupted in effect, automatically renewing on March 29 of every year and continuing unless or until either Party gives the other Party sixty (60) days prior written notice of termination

3. If any of the terms of any amendments or modifications to the Contract are inconsistent with the terms herein, the terms of this Amendment shall control.

Timberland XTO RATIFICATION AND AMENDMENT TO GAS PURCHASE CONTRACT 1



CONFIDENTIAL

PLAINTIFF'S EXHIBIT
24

BEER, ETAL v XTO
Case No. CIV-07-798-L
XTO 1052

4.    Except to the extent amended hereby, the terms of the Contract are hereby ratified and confirmed and are in full force and effect.

This Amendment is executed on the date first written above, but shall be effective as of March 28, 2006, at 7:00 a.m.

TIMBERLAND   GATHERING   &   PROCESSING COMPANY, INC.

By: _____
Name: NICK I. DUNGEY
Title: PRESIDENT

XTO ENERGY INC.

By: _____
Name: TERRY L. SCHULTZ
Title: SENIOR VICE PRESIDENT - MARKETING

CONFIDENTIAL

BEER, ET AL. v. XTO
Case No. CIV-07-798-L
XTO 1053