## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LADENE RAMSEY BEER, and<br>KATHERINE K. BOECK, (collectively<br>"Plaintiffs") on behalf of themselves and<br>others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>XTO ENERGY, INC. f/k/a CROSS<br>TIMBERS OIL COMPANY, a Delaware<br>Corporation ("XTO"),<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. CIV-07-798-L<br>)<br>)<br>)<br>)<br>)<br>) |

_____

## PLAINTIFFS' MOTION IN LIMINE
_____

Edward L. White, OBA #16549
Martin S. High, OBA #20725
Edward L. White, P.C.
13924-B Quail Pointe Drive
Oklahoma City, Oklahoma 73134
Telephone: (405) 810-8188
Facsimile:  (405) 608-0971
Email:   firm@edwhitelaw.com

**ATTORNEYS FOR PLAINTIFFS**

**March 15, 2010**

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

    Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

    Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

LEGAL FRAMEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT AND ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    XTO'S COUNSEL DIRECTED ITS DESIGNATED REPRESENTATIVES NOT TO ANSWER QUESTIONS ABOUT THE REASONABLENESS OF COSTS / EXPENSES AND CALCULATIONS RELATED THERETO, SO XTO'S FACT WITNESS SHOULD BE PRECLUDED FROM TESTIFYING ON THOSE SUBJECTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   XTO SHOULD NOT BE ALLOWED TO AFFIRMATIVELY USE INFORAMTION IT IMPROPERLY PRODUCED AFTER THE NOVEMBER 2, 2009 DISCOVERY CUTOFF . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  Working Interest Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.  Timberland Financial Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  XTO'S EXPERTS, IN FACT ALL OF THE EXPERTS, SHOULD BE BARRED FROM OFFERING LEGAL OPINIONS, AS STATING THE LAW IS THE PROVINCE OF THE COURT, AND ALLOWING EXERT TESTIMONY ON THE LAW RISKS IMPLYING THAT THE "EXPERT" IS "MORE KNOWLEDGEABLE THAN THE JUDGE" IN A GIVEN AREA OF THE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  Kris Terry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.  David Pierce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.    KRIS  TERRY  LACKS  THE  ACCOUNTING  EDUCATION  AND
       EXPERIENCE  NECESSARY  TO  TESTIFY  AS  AN  "EXPERT"  ON
       ACCOUNTING  ISSUES,  SO  SHE  SHOULD  BE  BARRED  FROM
       TESTIFYING  ABOUT,  *INTER  ALIA*,  THE  REASONABLENESS  OF
       COSTS INCURRED BY TIMBERLAND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V.     MABRY'S  REPORT  DOES  NOT  ASSERT  THE  REASONABLENESS  TO
       XTO'S  COSTS,  AND  HE  REFUSED  TO  TESTIFY  ABOUT  THEIR
       REASONABLENESS  IN  HIS  DEPOSITION,  SO  HE  SHOULD  BE
       BARRED FROM OFFERING ANY NEW OPINIONS ON THIS POINT AT
       TRIAL  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI.    CONSISTENT WITH FED. R. EV. 408 THE EXISTENCE AND AMOUNT
       OF  THE  BOOTH  CASE  AND  ITS  SETTLEMENT  SHOULD  NOT  BE
       REVEALED TO THE JURY EXCEPT AS SPECIFICALLY AUTHORIZED
       BY THE COURT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## **TABLE OF AUTHORITIES**

*Allison v. Ticor Title Ins.*,
       979 F.2d 1187, 1196 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*American Coal Sales Co. v. Nova Scotia Power Inc., Slip Copy*,
       2009 WL 467576 (S.D. Ohio Feb. 23, 2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Barreto v. Citibank, N.A.*,
       907 F.2d 15, 16 (1st Cir. 1990)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 5

*Booth, et al. v. Cross Timbers Oil Company now, XTO Energy, Inc.*,
       District Court, Dewey County, Oklahoma, Case No. CJ-98-16 . . . . . . . . . . . . 1, 18

*Bourjaily v. United States,*,
       483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Congressional Air, Ltd. v. Beech Aircraft Corp.*,
       176 F.R.D. 513, 516 (D. Md. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*First Savings Bank, F.S.B. v. U.S. Bancorp*,
       117 F. Supp. 2d 1078, 1081, 1082 (D. Kan. 2000)  . . . . . . . . . . . . . . . . . . . . . . . 2

*Howell v. Texaco, Inc.*,
    2004 OK 92; 112 P.3d 1154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Com'r of Public Safety*,
    735 N.W.2d 706, 711 (Minn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

*Klaczak v. Consolidated Medical Transport*,
    458 F. Supp. 2d 622, 688-69 (N.D. Ill. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Mittelstaedt v. Santa Fe Minerals, Inc.*,
    1998 OK 7; 954 P.2d 1203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*People v. Brown*,
    436 N.E.2d 696, 702 (Ill. App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*RLJCS Etner., Inc. v. Prof'l Benefit Trust Multiple Employer...Trust*,
    487 F.3d 494, 498 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rumsfeld v. United Tech. Corp.*,
    315 F.3d 1361, 1369 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Specht v. Jenson*,
    853 F.2d 805, 808-9 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Sydenstricker v. Hoham*,
    618 S.E.2nd 561 (W. Va. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*THK America, Inc. v. NSK Co. Ltd.*,
    157 F.R.D. 637, 648 (N.D. III. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Rules**

Federal Rules of Evidence (generally) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18

Federal Rules of Civil Procedure (generally) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    26(a)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    26(a)(1)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    26(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17
    37(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 7

## EXHIBITS

1. Bennie Kniffen 2-5-08 Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2. Bennie Kniffen 10-27-09 Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3. Post-Discovery Production Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

4. Selected Plaintiffs' Discovery Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5. XTO Working Interest Spreadsheet (XTO 1342) . . . . . . . . . . . . . . . . . . . . . . 6, 7

6. November 16, 2009 Email from Plaintiffs' Counsel to XTO . . . . . . . . . . . . . . . 6

7. February 17, 2010 Email from Plaintiffs' Counsel to XTO . . . . . . . . . . . . . . . . 7

8. Timberland Financial Information Spreadsheet (XTO 1210) . . . . . . . . . . . . . 7, 8

9. Kris Terry 6-18-08 Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10. Kris Terry Expert Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 15

11. David Pierce Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

12. David Pierce Expert Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

13. Kris Terry 1-22-10 Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

14. Order re. Kris Terry from *A-Cross Ranch, Ltd. v. Apache Corp.* . . . . . . . . . . . . 14

15. Apache's Objection to Motion to Exclude Kris Terry Testimony . . . . . . . . . . . 14

16. William Mabry Expert Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

17. William Mabry 1-20-10 Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## PLAINTIFFS' MOTION IN LIMINE

Plaintiffs ask the Court to address six separate evidentiary matters in this Motion in Limine.  First, Plaintiffs ask the Court to bar XTO's fact witnesses from addressing reasonableness of XTO's alleged costs.   The only reference by XTO's designated representatives to any substantive analysis of these costs by XTO related to an analysis which XTO successfully contended was privileged.  XTO should not be allowed to use at trial information it prevented Plaintiffs from obtaining during discovery by asserting a privilege.  Plaintiffs next ask the Court to bar XTO from affirmatively using two documents it produced well after the discovery cutoff.  Third, Plaintiffs ask the Court to prevent XTO's putative experts from offering improper legal opinions.[1]  Fourth, Plaintiffs ask the Court to preclude Kris Terry, XTO's putative gas marketing expert, from opining on accounting issues for which she has no meaningful qualifications and of which her deposition testimony demonstrated a woeful lack of knowledge.  Finally, Plaintiffs ask the Court to constrain Mr. Mabry's testimony to the boundaries he set for himself in his report and in his testimony.[2]  There is also an ancillary matter addressed that relates to a settlement in the *Booth* case; as the case was settled, its mention or use should be circumscribed consistent with Fed. R. Evid. 408.

---

[1] In Daubert motions, Plaintiffs separately urged the Court to refuse to allow XTO's proffered experts Kris Terry and David Pierce to testify at all as experts. (Doc. 142 re. Pierce and 143 re. Terry).  Plaintiffs endeavor herein to more specifically address objectionable parts of their proposed testimony, which Plaintiffs seek to exclude if the Court elects not to totally disqualify these experts.

[2] The same structure should apply to other experts as well.  Their testimony should be limited to opinions addressed in their reports and depositions.

## LEGAL FRAMEWORK

The motion in limine is a creature of neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence.  Such motions do aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial....The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground. The court may deny a motion in limine when it lacks the necessary specificity with respect to the evidence to be excluded.

*First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1081, 1082

(D. Kan. 2000) (citations omitted).  In ruling on this Motion in Limine, the Court is guided

by the Fed. R. Civ. P. and the Fed. R. Evid.  The party offering evidence bears the burden of

establishing its admissibility by a preponderance of the evidence. *Bourjaily v. United States*,

483 U.S. 171 (1987).

Fed. R. Civ. P. 37(c) provides that "if a party fails to provide information...the party

is not allowed to use that information...at trial...."  A wide range of sanctions may be imposed

for failure to comply with a scheduling order, and the Court's ruling in that regard will not

be reversed absent an abuse of discretion.

[A]ll orders governing the management of a case are enforceable under pain of sanction for unjustifiable violation. Trial judges have considerable discretion in the selection and imposition of sanctions.  We review their actions only for abuse of that discretion.  What lies behind the sanctioning power is...the necessity of invocation of an extreme sanction, where justified, in order to deter others from similar conduct....The plaintiff's attorney arrogated control of discovery to himself and changed the date of compliance to suit his own convenience and that of his client.  If such conduct were condoned by a slap on the wrist, ... the District Court ... might well find the lawyers calling the tune on discovery schedules.

*Barreto v. Citibank, N.A.*, 907 F.2d 15, 16 (1st Cir. 1990).  Further, dilatory tactics go against the spirit of modern discovery rules.  "[T]he philosophy underlying our discovery rules that a lawsuit should be an intensive search for the truth, not a game to be determined in outcome by consideration of tactics and surprise."  *In re Com'r of Public Safety*, 735 N.W.2d 706, 711 (Minn. 2007).

## ARGUMENT AND ANALYSIS

I.   XTO'S COUNSEL DIRECTED ITS DESIGNATED REPRESENTATIVES NOT TO ANSWER QUESTIONS ABOUT THE REASONABLENESS OF COSTS / EXPENSES AND CALCULATIONS RELATED THERETO, SO XTO'S FACT WITNESSES SHOULD BE PRECLUDED FROM TESTIFYING ON THOSE SUBJECTS.[3]

XTO's counsel repeatedly directed its designated representative not to answer questions posed to its designated representative regarding XTO's costs / expenses and any calculations done by XTO regarding those costs.

> Have you ever seen a calculation done that attempts to determine all the revenues received from Timberland Gathering system, including liquids and residue gas, to deduct from those revenues any expenses that are properly chargeable against a royalty owner and to arrive at a calculated value of how much the royalty owner would receive under that sort of format?

Ex. 1, Bennie Kniffen's Feb.  5, 2008 dep. at 41:22 to 42:22 (directing witness not to answer the foregoing question based on attorney-client privilege) and Ex. 2, Bennie Kniffen's Oct.  27, 2009 dep. at 7:23 to 10:23 (*defense counsel objecting*: "you've laid your predicate, you've asked for it, we've asserted privilege, so any...*further questioning would*

---

[3] XTO's expert witnesses' testimony on the issues of costs/expenses and calculations related thereto are addressed separately below.

*be waste of time*").  XTO's assertion of privilege was upheld over Plaintiffs' efforts to force

disclosure.  *See* Order (Doc 45) at 3, and Order (Doc. 149) also at 3.

A party that has asserted a privilege to prevent examination regarding an issue cannot

then use the allegedly privileged information at trial.  *THK America, Inc. v. NSK Co. Ltd.,*

157 F.R.D. 637, 648 (N.D. Ill. 1993) ("Of course, NSK cannot be compelled to waive the

attorney-client privilege. If, however, NSK chooses to stand behind the privilege and not

permit discovery, then NSK cannot introduce the opinions or testimony of counsel to show

that it is not guilty of willful infringement").  A ban on use of this information by XTO

appears to be required by FRCP 37(c) as well, which provides that "if a party fails to provide

information...the party is not allowed to use that information...at trial...."  Wherefore,

Plaintiffs ask the Court to bar XTO's fact witnesses from answering questions about the

reasonableness of costs / expenses and calculations related thereto.

II.     XTO SHOULD NOT BE ALLOWED TO AFFIRMATIVELY USE
        INFORMATION IMPROPERLY PRODUCED AFTER THE NOVEMBER 2, 2009
        DISCOVERY CUTOFF.

Discovery ended November 2, 2009 according to the operative scheduling order.

Nevertheless, XTO continued thereafter producing myriad documents that it either relies on

directly or upon which its experts rely.  Included in Ex. 3 are letters from defense counsel

dated December 15 and 21, 2009 and January 13 and 25, 2010 as well as an email dated

February 17, 2010 ("Post-discovery Production Letters").  The Post-Discovery Production

Letters document untimely production by XTO of the most meaningful documents disclosed

by XTO in this litigation.  However, Plaintiffs do not ask the Court to exclude all of the information XTO produced in an untimely fashion.  Rather, Plaintiffs ask the Court for a narrower ruling: (1) preventing XTO from using certain Timberland financial data in its case-in-chief; and (2) preventing any use or mention of data related to XTO's working interest in the class wells.

The information in the documents at issue was clearly subject to longstanding discovery requests.  *See* Ex. 4, selected discovery requests.  Further, even if Plaintiffs never requested the data, it was subject to spontaneous identification under FRCP 26(a)(1)(ii) or (iii) as relevant to XTO's defenses and/or to computation of costs for which XTO bears the burden of proof.  XTO disputed the relevance of the requested data when the requests were propounded,[4] but XTO's expected vigorous protests of this effort to exclude the data will bear testimony to the fact that the documents actually go right to the heart of the matters at issue and should have been produced long ago.  As noted in *Barreto v. Citibank, N.A.*, 907 F.2d 15, 16 (1st Cir. 1990), "if such conduct were condoned by a slap on the wrist, ... the District Court ... might well find the lawyers calling the tune on discovery schedules."

In addition, there is inherent unfairness in XTO's behavior toward Plaintiffs in this case.  XTO waited until well after the discovery cutoff, and more than five years into this litigation, to produce key documents.  XTO now wants to use those same documents in its

---

[4] Having asserted that the information at issue is not relevant and, thus, not subject to production, XTO should be estopped from now using it in their case-in-chief.  *See, e.g., Sydenstricker v. Mohan*, 618 S.E.2d 561 (W. Va. 2005) (setting out the elements of estoppel).

case-in-chief.  XTO's calculated dilatory conduct should not be allowed to benefit it.  "[T]he philosophy underlying our discovery rules that a lawsuit should be an intensive search for the truth, not a game to be determined in outcome by consideration of tactics and surprise."  *In re Com'r of Public Safety*, 735 N.W.2d 706, 711 (Minn. 2007).

**A. Working Interest Data**.  Three and one-half months after the close of discovery, on February 17, 2010 – well after even expert discovery closed on January 11, 2010 – XTO produced a spreadsheet containing information on XTO's working interest percentages in class wells.  The working interest spreadsheet is identified as XTO 1342, and it is attached hereto as Ex. 5.  There was discussion around the time of the discovery cutoff regarding XTO potentially producing working interest data.   Plaintiffs' counsel expressed the opinion that XTO was free to choose not to produce working interest data, but if XTO chose that path, it also arguably waived the right to use it in its own defense.  Ex. 6, November 16, 2009 email from Plaintiffs' counsel to XTO's counsel.[5]  Plaintiffs' expert prepared her expert

---

[5] Regarding working interest data, defense counsel had emailed the following to Plaintiffs' counsel on Nov.  16, 2009 at 2:50 p.m.:

> XTO maintains its position that it has produced all of what was requested and what is relevant to Plaintiffs' claims and XTO's defenses. Plaintiffs' request for working interest data is separate and apart from the list of wells dedicated to each contract, especially in light of the fact that the contracts are not defined by working interests but only by the wells XTO operates.

In response on that same day at 3:28 p.m., Plaintiffs' counsel responded with the following:

> It's fine if XTO doesn't produce working interest data, but it produced some
> (continued...)

report using the data available, which pointedly did not include working interest data.  XTO never indicated to Plaintiffs an intent to produce the working interest data.  Expert discovery closed.  Then, more than three months after the close of discovery, XTO produced a working interest spreadsheet.  Plaintiffs immediately objected to production of this spreadsheet and advised XTO that they would seek to bar any use of this grossly tardy document.  Ex. 7, February 17, 2010 email from Ed White to Mark Banner et al.  Plaintiffs counsel then sought a discovery conference to discuss related issues.[6]  This behavior by XTO amounts to XTO setting its own discovery schedule and ignoring the schedule established by the Court. Plaintiffs thus ask the Court to bar any use or mention of XTO 1342 (Ex. 5).

**B.  Timberland Financial Data**.  On December 21, 2009, nearly two months after discovery ended, XTO produced a spreadsheet containing all of the financial information for Timberland on an annualized basis for the period from 1995 - 2009.  The cover letter is included in Ex. 3, and the produced spreadsheet (XTO 1210) is attached as Ex. 8.  The data contained in the spreadsheet forms the basis for all of the calculations performed by XTO's accounting expert, Mr. Mabry, and for Scenario 3 calculations by Plaintiffs' expert, Cynthia

---

[5](...continued)
of the data, so clearly it thought it was relevant. If XTO doesn't produce such data, calculations on damages may be too high as they are not reduced to account for royalties paid by others. Plaintiffs again refer to FRCP 37(c).

[6] This request for a discovery conference was ignored by XTO, as has been XTO's custom in this case.

Heymans.[7]  Plaintiffs ask the Court for a ruling barring XTO from using this cost information in its case-in-chief.  *See, e.g., American Coal Sales Co. v. Nova Scotia Power Inc., Slip Copy*, 2009 WL 467576 (S.D. Ohio Feb. 23, 2009);[8] *People v. Brown*, 436 N.E.2d 696, 702 (Ill. App. 1982).  This asymmetry may, on first blush, appear harsh, but XTO flouted the Court's scheduling order holding back this highly relevant information for more than five years.  That sort of dilatory conduct merits imposition of a significant penalty, and such a penalty has precedent.  Wherefore, Plaintiffs ask the Court to bar any use by defendant of XTO 1210 (Ex. 8) in XTO's case-in-chief.

---

[7] The absence of meaningful data needed to perform the liquids calculation was one of the reasons that Plaintiffs' counsel waived recovery of liquids ***at the time of the class certification hearing***, but Plaintiffs continued to seek information that would allow them to perform liquids calculation to see if such a claim was viable.  Once XTO at very long last produced the data, the relevant calculations were performed, and the liquids claim was actively presented.   XTO should not benefit from its calculated dilatory conduct in this regard.  The claimed waiver will be addressed in detail in Plaintiffs' response to XTO's motion in limine (Doc.  172).

[8] *American Coal Sales* precluded the party that wrongfully failed to timely produce a report from using it in defense of a summary judgment motion, and Plaintiffs ask the Court to also impose that sanction here.  XTO should not be allowed to rely on XTO 1210 in defense of Plaintiffs' pending summary judgment motion.

III.    XTO'S EXPERTS, IN FACT ALL OF THE EXPERTS, SHOULD BE BARRED
        FROM OFFERING LEGAL OPINIONS, AS STATING THE LAW IS THE
        PROVINCE OF THE COURT, AND ALLOWING EXPERT TESTIMONY ON THE
        LAW RISKS IMPLYING THAT THE "EXPERT" IS "MORE KNOWLEDGEABLE
        THAN THE JUDGE" IN A GIVEN AREA OF THE LAW.[9]

The Court should exclude the expert testimony of an attorney-witness, where that

testimony invades the province of the Court as the legal expert in the case. *Specht v. Jenson*,

853 F.2d 805, 808-9 (10th Cir. 1988). The danger in producing an attorney-witness and

allowing that attorney-advocate-witness to testify is that the jury may inherently take the

testimony as fact and not be able to effectively question the veracity of the witness.

Certainly, as *Specht* at 808-09 notes, the jury may not be able to see behind the veiled

advocacy of the attorney-witness:

> The jury may believe the attorney-witness, who is presented to them imbued
> with all the mystique inherent in the title "expert," is more knowledgeable than
> the judge in a given area of the law. … Thus, there is a substantial danger the
> jury simply adopted the expert's conclusions rather than making its
> own decision.

**A. Kris Terry**. Ms. Terry is an attorney, and she cannot resist the temptation of

advocating the legal positions of the company that pays her wage. Ms. Terry readily admits

that she was not hired as a legal expert. Ex. 9, Kris Terry's June 18, 2008 dep. at 34:25 -

35:14. Yet, Kris Terry's report and her testimony are replete with legal opinions. Her report

is included as Ex. 10, and the legal opinions she offers are highlighted in yellow. Plaintiffs

ask the Court to bar Ms. Terry from testifying on the matters highlighted in yellow in Ex. 10.

---

[9] This proposition is an alternative to the requested disqualification of putative experts
Terry and Pierce. See n.1, above.

Paragraphs of her report affected are all or part of the following: 4, 10, 12, 13, 15 - 18, 22, 23, 25 - 28, and 30.  Examples of her improper legal testimony include her assertion that "[t]here is no intracompany reference contract here such as the one in *Howell [v. Texaco*, 2004 OK 92; 112 P.3d 1154], but an actual contract between two separate entities."  Ex. 10 at ¶13.  That is a clear legal conclusion and it conflicts with the Court's determination, as a matter of law, that XTO cannot properly base royalties on the XTO-Timberland transaction. She later asserts that "[e]vidence concerning sales transactions at the leases in a particular area and the competitiveness of the market for gas is relevant to the determination of whether that gas is 'marketable' or is a 'marketable product.'" Ex. 10 at ¶17.  That may or may not end up being the legal determination the Court makes regarding the relevance of the evidence asserted.  However, it is not Ms. Terry's place to make the determination.  In one of her bolder moments, Ms. Terry grants XTO summary judgment in their favor on the reasonableness of its costs and whether they increase royalties in proportion to the amount expended, to wit, she asserts: "In sum, I believe all of the requirements of the *Mittelstaedt [v. Santa Fe Minerals, Inc.*, 1998 OK 7; 954 P.2d 1203] test have been met at the well." Ex. 10 at ¶18.  XTO itself did not have the temerity to ask the Court for such a determination, but Ms. Terry assumes the weight of making that legal ruling upon herself.  Plaintiffs could address each instance of Ms. Terry offering legal opinions in detail in this Motion, but they speak for themselves.  The Court will have to examine each in context to make its own determination about whether the yellow highlighted sections of her report in Ex. 10 comprise

improper legal opinions. Wherefore, to prevent the jury from mistakenly believing that "the attorney-witness, who is presented to them imbued with all the mystique inherent in the title "expert," is more knowledgeable than the judge in a given area of the law," Plaintiffs ask the Court to bar XTO from offering Ms. Terry to proffer legal opinions on the subjects highlighted in yellow in her report.[10]

**B. David Pierce**. As with Ms. Terry, David Pierce is an attorney. However, he is even more clearly a putative legal expert than her as he is a law professor. Mr. Pierce admits that, to the extent his testimony amounts to offering legal opinions, it is improper. Ex. 11, Pierce dep. at 110:19 - 111:15. Whether XTO argues the fact or not, there is a huge risk that a jury will view Mr. Pierce, a well-spoken tenured professor at a law school, as **_the_** "go to guy" when it comes to the law applicable in this case. Mr. Pierce's report is really a draft of a law review article, and Mr. Pierce admitted that he was probably going to write a law review article on the same subject. Ex. 11 at 110:7 - 11. The risks highlighted in *Specht* that the jury will "believe the attorney-witness, who is presented to them imbued with all the mystique inherent in the title 'expert,' is more knowledgeable than the judge in a given area of the law" are accentuated with regard to a law professor. Plaintiffs ask the Court to carefully review Mr. Pierce's report, attached as Ex. 12, and the yellow highlighted portions of Mr. Pierce's report in this regard. Plaintiffs ask the Court to bar Mr. Pierce from testifying on the matters highlighted in yellow in Ex. 12. Pages of his report affected are all or part of

---

[10] The green highlighting in her report relates to her proffered accounting opinions and analysis, which is addressed in Section IV, below.

the following: 3, 7, 11, 12 - 17, 20 - 27.  Examples of his improper legal testimony include

his blunt assertion that affiliated party sales are not an improper practice.  Ex. 12 at p.3

(under opinion #7).  Later, Mr. Pierce relies on his own law review article as support for his

legal assertion that the XTO-Timberland sale is a proper basis for royalties absent a showing

of fraud.  Ex. 12 at p.26, 27.  Mr. Pierce should be barred from even hinting to the jury that

his legal opinion supports the propriety of basing royalties on an affiliate sale.  He purports

to tell the jury about one case that the Kansas Corporation Commission's "goal was to ensure

that when the gas was sold, the lessee and lessor would receive...the 'fair and reasonable

value' of the gas at the wellhead."  Ex. 12 at p.7.  The case he references speaks for itself.

The Kansas Corporation Commission ruled as it saw fit in that case.  XTO is free to argue

that case to the Court as a basis for a particular ruling or as a basis for a jury instruction.

What seems blatantly improper is to dress this legal argument up as some sort of expert

testimony about historical facts and trot it out to the jury.  Pierce  broadly asserts that the

"Kansas...and Oklahoma Supreme Court have recognized this industry custom and usage by

dealing with natural gas as a marketable product at the wellhead even when the lease does

not contain 'at the well' or similar language."  Ex. 12 at p.12, 13.  For the next several pages,

he attempts to justify his legal conclusion by reference to case law.  This sort of legal

argument is fine when made by counsel to the Court in a brief.  It is immensely misleading

when it is couched as "expert" testimony from a law professor under oath on the stand.  He

next stunningly asserts that "[f]or over 60 years interstate pipelines have purchased gas at

Hugoton field wellheads for a wellhead price without inquiry or concern for what the pipeline did to get the gas to an end-user." Ex. 12 at p.15. That sort of broad-brush characterization implies a level of legal clarity that simply does not exist. The Court and, frankly Mr. Pierce if he is as familiar as he purports to be with the natural gas industry, are well aware of myriad cases challenging how royalties are paid regarding wells from the Hugoton field. Not only is this a misleading legal characterization, it flies in the face of oil and gas litigation reality as it is understood by anyone familiar with oil and gas litigation. Legal arguments about the meaning of contracts belong in briefs, not expert reports. *RLJCS Enter., Inc. v. Prof'l Benefit Trust Multiple Employer Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007) ("argument about the meaning of trust indentures, contracts, and mutual-to-stock conversions belongs in briefs, not 'expert' reports"); *Allison v. Ticor Title Ins.*, 979 F.2d 1187, 1196 (7th Cir.1992) ("the basic premise that an expert may not testify to the legal significance of a contract is unavoidable"); *Rumsfeld v. United Tech. Corp.*, 315 F.3d 1361, 1369 (Fed. Cir.2003) (legal interpretation of regulations belongs in briefing and argument). Wherefore, to prevent the jury from mistakenly believing that "the attorney-witness, who is presented to them imbued with all the mystique inherent in the title "expert," is more knowledgeable than the judge in a given area of the law," particularly troubling given that Mr. Pierce is a law professor, Plaintiffs ask the Court to bar XTO from offering Ms. Pierce to proffer legal opinions on the subjects highlighted in yellow in his report.

IV.   KRIS TERRY LACKS THE ACCOUNTING EDUCATION AND EXPERIENCE
NECESSARY TO TESTIFY AS AN "EXPERT" ON ACCOUNTING ISSUES, SO
SHE SHOULD BE BARRED FROM TESTIFYING ABOUT, *INTER ALIA*, THE
REASONABLENESS OF COSTS INCURRED BY TIMBERLAND.

Ms. Terry purports to address various accounting issues, which is remarkable given
that her only meaningful accounting credentials are a basic undergraduate class in accounting
many years ago and some continuing legal education classes dealing with regulated
accounting practices.  Ex. 13, Kris Terry Jan. 22, 2010 dep. at 39:20-40:20.  Her professional
experience with accounting is relegated to her litigation work as an expert.   Id. at
40:20-41:23.  She is also not an engineer so has no basis for opining on the whether the
processing that occurs at the Timberland plant is necessary or reasonable to increase the
value of the gas as it passes through the plant.

In no way does Ms. Terry's accounting "experience" qualify her as an accounting
expert, a fact that was implicitly recognized in an order by Judge Thomson in *A-Cross Ranch,
Ltd. v. Apache Corp*., in the Western Dist. of Okla., Case No. CIV-04-200-T, attached as
Ex. 14.  Further, the XTO's attorney in this case was also representing Apache Corp. in the
above-noted case, and, in their response to a Daubert motion regarding Ms. Terry failed to
argue that Ms. Terrry was an accounting expert.  *See* Ex. 15, Apache's Objection to
Plaintiff's Motion to Exclude Testimony of Defendant's Expert, Kris Terry.  As in *Klaczak
v. Consolidated Medical Transport*, 458 F. Supp. 2d 622, 668 - 69 (N.D. Ill. 2006), Ms. Terry
never worked in the accounting field and she never had any meaningful education in the
field, and further her deposition testimony on accounting issues was muddled, at best.  The

following exchange illustrates her paucity of knowledge about itemization of costs listed on

a document specifying the costs Timberland seeks to assess against Plaintiffs:

> Q: What about operating non-labor, do you know what that is?
> A I did, I don't – I can't tell you for sure, I'm sure Mr. Mabry probably went through that, I don't know for sure.
> Q: You don't know what non-labor is?
> A: No, I understand –
> Q: Do you know what plant gathering system lease amortization is?
> A: Right, they have a – I thought that amortization had to do with the way in which the – well, I may be wrong about that. I think that's just the depreciation, isn't it, the amortization is just the depreciation of the system?
> Q: Well, there's depreciation and amortization is a separate line.
> A: And then they have a separate lease amortization, isn't that related to – well, I – I don't know the answer to that. Mr. Mabry's a better person to answer that than me.
> Q: Do you know what the general administrative is?
> A: I assume that that's overhead that they pay to have – their – I was thinking general administrative – I don't know, because there – there's a component of general administrative, I think that's attributable to the employees out there and then there's a component of general administrative that's related to things that are done for them here in Ft. Worth.

Ex. 13 at 239:4-240:8. So, even though she is completely unfamiliar with the meaning

of multiple entries in XTO's accounting spreadsheets detailing its costs, Ms. Terry seeks

leave to testify as an expert that these expenses are "reasonable." Ex. 10 at ¶18 - 20 and n.10.

She certainly cannot  make these statements on the strength of her own expertise or her

personal knowledge of the facts behind any of the costs incurred.  Wherefore, Plaintiffs ask

the Court to bar Ms. Terry from testifying about the accounting matters highlighted in green

in Ex. 10.  To the extent she restates Mr. Mabry's testimony, XTO should have him state his

opinions directly.  The proper scope of Mabry's expert testimony is addressed in Prop. V, below.

V.    MABRY'S REPORT DOES NOT ASSERT THE REASONABLENESS OF XTO'S COSTS, AND HE REFUSED TO TESTIFY ABOUT THEIR REASONABLENESS IN HIS DEPOSITION, SO HE SHOULD BE BARRED FROM OFFERING ANY NEW OPINIONS ON THIS POINT AT TRIAL.[11]

Fed. R. Civ. Pro. 26(a)(2) requires "a complete statement of all opinions to be expressed by the expert witness [and] a complete statement of the bases and reasons for those opinions."

> If parties are allowed to change the nature and scope of their expert's opinions after the Court has imposed deadlines and as late as the time of submission of the Pre-Trial Order, parties would in effect be encouraged to wait until such time to make known new theories, thereby minimizing the opportunity for the exploration of countervailing opinions. Such "trial by ambush" is precisely what the 1993 revision of the Federal Rules is attempting to eliminate.

*Congressional Air, Ltd. v. Beech Aircraft Corp.*, 176 F.R.D. 513, 516 (D. Md. 1997). Allowing a witness to add opinions after his report has been submitted and his deposition taken would make a mockery of Fed. R. Civ. Pro. 26(a)(2), and it would amount to "trial by ambush" as noted in *Congressional Air*.

Mabry's report, attached as Ex. 16, nowhere asserts that Timberland's costs / expenses are "reasonable" nor does he opine that they increase royalties in proportion to the expenditures. Instead, he simply takes the costs reported by Timberland and performs his analysis using them.  There is no discussion of reasonableness or resulting increase in royalty revenue.  At deposition, his reticence on these points continued.

---

[11] The same premise should generally apply to all experts in this case for the same sort of reasons noted below.

Q: Are you here to testify about the reasonableness of the operating labor expense shown on [XTO production page] 1216?

A: No, sir.

Q: Are you here to testify about the reasonableness of the operating non-labor expense shown on 1216?

A: No, sir.

Q: Are you here to testify at all about the reasonableness of any of...the numbers shown on 1216 as far as it goes to expenses?

A: No, I don't have any independent verification as to the amount of the numbers, I just know from my experience that income statements, that these are the type of expenses that you would typically find that go into the total expense of a processing plant.

Q: And you're not here to testify whether those expenses should be passed on to the royalty owners or not?

A: No, that would be more of a legal decision.

***

Q: Now, all these...these entries under expenses on 1216, gas purchase, operating labor, operating non-labor, general administrative on this plant and gathering systems, depreciation and so forth, you have no opinion on whether those expenses are reasonable?

A No, sir. I haven't audited these numbers to determine whether they are reasonable.

Ex. 17, Mabry's Jan. 20, 2010 dep. at 64:14 - 65:10; and 71:24 - 72:6.  See also Id. at 98:6 - 16; 104:12 - 18; and 105:15 - 18.  Mr. Mabry left no doubt that he was NOT going to testify about the reasonableness of XTO's expenses.

Similarly, his report says nothing about whether revenues increased in proportion to the expenses incurred.  See Ex. 16.  He testified that his written report includes all of the opinions he plans to offer.  Therefore, it appears that he has no intent to opine on whether revenues increased in proportion to expenses incurred.  Ex. 17 at 98:2 - 5.

Fed. R. Civ. Pro. 26(a)(2) requires "a complete statement of all opinions to be expressed by the expert witness [and] a complete statement of the bases and reasons for

those opinions."  Allowing Mr. Mabry to add opinions now would amount to "trial by ambush," which "is precisely what the 1993 revision of the Federal Rules is attempting to eliminate."  *Congressional Air, Ltd. v. Beech Aircraft Corp.*, 176 F.R.D. 513, 516 (D. Md. 1997).  Wherefore, Plaintiffs ask the Court to bar Mabry from testifying that XTO's expenses / costs are reasonable or that they increase royalties in proportion to the amount expended.

VI.  CONSISTENT WITH FED. R. EV. 408, THE EXISTENCE AND AMOUNT OF THE BOOTH CASE AND ITS SETTLEMENT SHOULD NOT BE REVEALED TO THE JURY EXCEPT AS SPECIFICALLY AUTHORIZED BY THE COURT.

Fed. R. Ev. 408 generally prohibits use of settlements as evidence.  It is conceivable that the prior *Booth v. XTO* case and the settlement therein may need to be addressed by the Court during the course of the trial.  The case, and the settlement therein, certainly has come up during briefing.  However, should either party deem mention of *Booth* to be justified, Plaintiffs ask that there be a bench conference prior to spontaneous discussion of the case. Plaintiffs ask that the Court direct the parties to instruct their witnesses not to discuss the case without prior authorization from the Court.

Respectfully submitted,

/s/ Edward L. White
_____
Edward L. White, OBA #16549
Martin S. High, OBA #20725
EDWARD L. WHITE, P.C.
13924-B Quail Pointe Drive
oklahoma City, Oklahoma 73134
Telephone: (405) 810-8188
Facsimile: (405) 608-0971
Email: ed@edwhitelaw.com
**ATTORNEYS FOR PLAINTIFF**

## Certificate of Service

I hereby certify that on March 15, 2010, I electronically transmitted this document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following:

| | |
|---|---|
| James M. Peters jpeters@monnethayes.com<br>Michael S. Peters mpeters@monnethayes.com<br>Robert A. French bfrench@monnethayes.com | Mark Banner mbanner@hallestill.com<br>James Hardwick Hardwickjhardwick@hallestill.com<br>Karissa Cottom kcottom@hallestill.com |

/s/ Edward L. White
_____