IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

BILL FANKHOUSER and TIM GODDARD, )
on behalf of themselves and all others )
similarly situated, )
　)
　　　　　　　Plaintiffs, )
　)
vs. )　　Case No. CIV-07-798-L
　)
XTO ENERGY, INC. f/k/a CROSS )
TIMBERS OIL COMPANY, a Delaware )
Corporation ("XTO"), )
　)
　　　　　　　Defendant. )

# O R D E R

Plaintiffs Bill Fankhouser and Tim Goddard are royalty owners in wells operated by defendant XTO Energy, Inc. ("XTO").   Fankhouser owns royalty interests in three gas wells located in Texas County, Oklahoma and one well located in Kearny County, Kansas.   Goddard owns royalty interests in two wells located in Seward County, Kansas.   The wells produce gas from the Chase formation in the Guymon-Hugoton field.   Plaintiffs assert three claims for relief on behalf of themselves and others similarly situated:   breach of contract, breach of fiduciary duty, and unjust enrichment.   In addition, plaintiffs seek the equitable remedy of an accounting for themselves and members of the class.   On December 16, 2010, the court certified this matter as a class action.   The class consists of:

> Non-governmental royalty owners who received payments based on production from a well that is/was operated by XTO Energy, Inc., for which the production is/was sold to

> Timberland Gathering and Processing Co., Inc., and processed at the Tyrone natural gas processing plant.
>
> > *Kansas Subclass*. Royalty owners encompassed within the definition set forth above, who received royalties from at least one well located in the State of Kansas.
> >
> > *Oklahoma Subclass*. Royalty owners encompassed within the definition as set forth above, who received royalties from at least one well located in the State of Oklahoma.
>
> *Excluded Claims*. All released claims under the settlement agreement entered in *Booth v. Cross Timbers Oil Co.*, No. CJ-98-16 (Okla. Dist. Ct. Dewey County 2002).

Fankhouser v. XTO Energy, Inc., Case No. CIV-07-798-L, mem. op. at 15 (W.D. Okla. Dec. 16, 2010) (Doc. No. 261).

This matter is before the court on Plaintiffs' Motion for Partial Summary Judgment for Breach of Contract and Fiduciary Duty (Doc. No. 292) [hereinafter cited as "Plaintiffs' Motion"].  Plaintiffs seek a ruling that, as a matter of law, XTO has breached the implied covenant of marketability.  In addition, plaintiffs ask the court to rule as a matter of law that XTO owes a fiduciary duty to the class and that it has breached that duty.

Summary judgment is appropriate if the pleadings, affidavits, and depositions "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  Any doubt as to the existence of a genuine issue of material fact must be resolved against the party

seeking summary judgment.  In addition, the inferences drawn from the facts presented must be construed in the light most favorable to the nonmoving party. Board of Education v. Pico, 457 U.S. 853, 863 (1982).  Nonetheless, a party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact; rather, the party must "set out *specific* facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2) (emphasis added).  *See also*, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  In addition, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The undisputed facts establish that XTO operates and produces raw or unprocessed natural gas from all of the class wells.  XTO sells the gas from the class wells to its wholly owned subsidiary, Timberland Gathering and Processing Co., Inc. ("Timberland"), at or near the wellhead.  All of the raw gas from the class wells is gathered, commingled, and compressed by Timberland into its gathering system and transported through the Timberland gathering system to the inlet of the

3

Tyrone gas processing plant, which is also operated by Timberland.  Exhibit 7 to Plaintiffs' Motion at 24-26, 28.  For the majority of the wells, the pressure of the gas at the wellhead is 10 pounds per square inch ("psi") or less.  Exhibit 14 to Plaintiffs' Motion at 114.  Thus, in order for Timberland to move the raw gas through its gathering system, it must compress the raw gas using multiple off-lease compressors in various locations on its gathering system.  Exhibit 14 to Plaintiffs' Motion at 114-15, 120-21, 125.  At the plant, Timberland processes the gas to extract natural gas liquids ("NGLs").[1]  All of the gas entering the Tyrone plant from whatever source is processed by Timberland in the same manner, without regard to the source well, even though some wells produce gas with higher entrained NGLs than other wells.  Exhibit 7 to Plaintiffs' Motion at 28-29.  At the tailpipe of the Tyrone plant, Timberland sells the residue gas[2] to Cross Timbers Energy Services, Inc. ("CTES"), another wholly-owned subsidiary of XTO.  Exhibit 6 to Plaintiffs' Motion at 26; Exhibit 16 to Plaintiffs' Motion at 11.  CTES – without transporting or performing any other processing[3] – then sells the residue gas to an unaffiliated company, DCP

---

[1]NGLs are hydrocarbons that are separated from the natural gas stream in the form of liquids and generally consist of propane, ethane, butane, isobutane, lease condensate, natural gasoline, and liquified petroleum gases. *See* U.S. Energy Information Administration, Independent Statistics & Analysis, Glossary at http://www.eia.doe.gov/glossary/index.cfm.  Typically, gas with a higher British Thermal Unit ("Btu") content contains more NGLs than lower Btu content gas.

[2]Residue gas is "[n]atural gas from which natural gas processing plant liquid products and, in some cases, nonhydrocarbon components have been extracted."  U.S. Energy Information Administration, Independent Statistics & Analysis, Glossary at http://www.eia.gov/tools/glossary/ index.cfm.  *See also* Exhibit 6 to Plaintiffs' Motion at 76 (residue gas is gas after the liquids are removed).  The principal component of residue gas is methane.  Exhibit 5 to Plaintiffs' Motion at 37.

[3]Indeed, CTES does not have any employees.  Exhibit 6 to Plaintiffs' Motion at 48.

Midstream, formerly known as Duke Energy Field Services, LP ("Duke").  Exhibit 6 to Plaintiffs' Motion at 74-76; Exhibit 19 to Plaintiffs' Motion.  Since December 1, 2005, Duke has paid CTES the Panhandle Eastern Index price for residue gas less $0.01 per thousand Btu dry.  Exhibit 20 to Plaintiffs' Motion at ¶ 2.

CTES pays 100 percent of the price it receives from Duke to Timberland; in effect, there is a straight pass-through of the monies received from Duke.  Exhibit 11 to Plaintiffs' Motion at 241; Exhibit 18 to Plaintiffs' Motion at 9.  Timberland then pays XTO 80 or 85 percent of the monies it receives from CTES as payment for the gas it purchases at the well.  The percentage paid to XTO is spelled out in two contracts.  Under the first contract, executed on March 29, 1996, XTO is paid 80 percent of Timberland's weighted average residue price.  Exhibit 12 to Plaintiffs' Motion at art. V, sec.  1.  This contract governs the sale of gas from the Chase formation, from which the majority of the wells in the class produce.  The second contract was executed on June 1, 1997.  This contract, which governs sales of gas from zones below the Chase formation, specifies that XTO receives a price equal to 85 percent of Timberland's weighted average sales price.  Exhibit 13 to Plaintiffs' Motion at art. IV, sec. 1(a).  Timberland's weighted average sales price is the price Timberland receives from CTES, which, in turn, is the price CTES receives from Duke.  *See* Exhibit 6 to Plaintiffs' Motion at 73-76.  Although Timberland extracts and sells NGLs from the gas stream, it does not pay XTO any additional amount based on the end-value of the NGLs.  Thus, the price received by XTO, and upon which it bases its

royalty calculations, is 80 or 85 percent of the price paid by Duke to CTES for the residue gas.  *See* Exhibit 18 to Plaintiffs' Motion for Class Certification at 22-23 (Doc. No. 246-18).  According to Terry Schultz, XTO's Senior Vice President of Marketing and an officer of CTES, Timberland's retention of 15 to 20 percent of the monies paid to it by CTES is to compensate Timberland for metering, gathering, compressing, and transporting the gas to the buyer.  Exhibit 14 to Plaintiffs' Motion at 114, 120-21, 125.

Plaintiffs charge that XTO breached the implied duty to market by charging royalty owners for the costs incurred to put the gas into marketable condition.  As the court noted in its ruling on XTO's motion for partial summary judgment:

> Oklahoma and Kansas law recognizes in oil and gas leases an implied duty on the lessee's part to market production.  "[T]he implied duty to market means a duty to get the product to the place of sale in a marketable form."  Wood v. TXO Production Corp., 854 P.2d 880, 882 (Okla. 1993).  The lessee bears the costs of putting the gas into a marketable condition, and such costs may not be charged to royalty owners.  *See* Mittelstaedt v. Santa Fe Minerals, Inc., 954 P.2d 1203, 1205 (Okla. 1998); TXO Production Corp. v. Commissioners of Land Office, 903 P.2d 259, 262-63 (Okla. 1995); Sternberger v. Marathon Oil Co., 894 P.2d 788, 791 (1995); Wood, 854 P.2d at 882.  Oklahoma courts have held that the implied duty to market "prohibits a lessee from deducting a proportionate share of transportation, compression, dehydration, and blending costs when such costs are associated with creating a marketable product."  Mittelstaedt, 954 P.2d at 1205.

Fankhouser v. XTO Energy, Inc., Case No. CIV-07-798-L, ord. at 3-4 (W.D. Okla. Feb. 23, 2012) (Doc. No. 357).  Likewise, Kansas law provides that "[a]bsent a contract providing to the contrary, a non-working interest owner is not obligated to bear any share of production expense, such as compressing, transporting, and processing, undertaken to transform gas into a marketable product."  Sternberger, 894 P.2d at 800.

Plaintiffs claim that gas from the class wells is not marketable at the well because it requires dehydration, compression, gathering, and removal of impurities – including natural gas liquids ("NGLs").  XTO counters that the gas is marketable at the well because that is where it is bought and sold.  It argues:

> In interpreting a contract where the issue was whether there was a market for gas, the Oklahoma Supreme Court said "market" is "the opportunity for selling the commodity (gas) from the Bertha Johnson well, that is the existence of a commercial demand for the same."  The gas produced from wells on the Timberland System is marketable at the well.  There is a commercial demand for the gas as shown by Timberland's purchase of gas produced from wells connected to the Timberland System from many unaffiliated third parties.  Further, there is a long history of wellhead sales of unprocessed gas in the geographic area at issue.  There are numerous midstream companies in the area that buy gas at the well in its natural state, thus underscoring a commercial demand for unprocessed gas.  Therefore, the gathering, transportation, compression and processing performed by Timberland enhances an already marketable product.

Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment and Brief in Support at 16 (Doc. No. 302) (citations omitted).

XTO's argument, however, confuses market with marketable condition. The two are not synonymous. *See* Naylor Farms, Inc. v. Anadarko OGC Co., Case No. CIV-08-668-R, ord. at 7 (W.D. Okla. Oct. 14, 2011) (Doc. No. 245); Sternberger, 894 P.2d at 800 ("In the case before us, the gas is marketable at the well. The problem is there is no market at the well".) "[T]he implied duty to market means a duty to get the product to the place of sale *in marketable form.*" Wood, 854 P.2d at 882 (emphasis added). Moreover, it is XTO's burden to establish that the gas is in marketable condition at the well,[4] and it has not done so. Rather, the evidence before the court demonstrates that the gas from the class wells requires considerable compression as some wells are operating at a vacuum and others have pressure as low as 10 psi. Exhibit 14 to Plaintiffs' Motion at 114, 122. The contract with Duke, however, requires the gas to be delivered at 600 psi. Exhibit 14 to Plaintiffs' Motion at 114; Exhibit 19 to Plaintiffs' Motion at 1 ¶ 3. Kansas and Oklahoma law is clear that royalty owners may not be charged with compression costs that are necessary to put the gas into marketable condition and that a producer may not escape its duty to market by contracting with a third party. Mittelstaedt, 954 P.2d at 1210 ("We decline to turn compression costs into costs paid by the royalty interest merely by moving the location of the compression off the lease."); TXO Prod. Corp., 903 P.2d at 261 ("where there is no agreement between the lessor and lessee

_____

[4]*See* Mittelstaedt, 954 P.2d at 1208 ("When the gas is shown *by the lessee* to be in a marketable form at the well the royalty owner may be charged a proportionate expense of transporting that gas to the point of purchase.") (emphasis added).

to share compression costs, we would not require the lessor to bear a portion of those costs."); Sternberger, 894 P.2d at 799 ("cost of compression which occurs away from the mouth of the well are not deductible even where . . . the royalty is to be paid based on market price at the mouth of the well.").   In addition to the compression issues, the Duke contract requires the seller to "deliver gas meeting the quality requirements and to avoid the delivery of Inferior Liquids as defined in Exhibit A, Section A(g)."[5]  Exhibit 19 to Plaintiffs' Motion at 2 ¶ 4(c).  The contract also demands the gas delivered to Duke to "be free of water and hydrocarbons in liquid form" and limits the amount of hydrogen sulfide, oxygen, carbon dioxide, and sulfur. Id. at A3, ¶ E.1.  XTO, however, offered no evidence that the gas at the wellhead was sufficiently free of impurities that it did not require processing before it was in marketable condition.

Moreover, even if XTO had sustained its burden of establishing the marketable condition of the gas at the wellhead, it has not sustained its burden under Mittelstaedt and Sternberger.  Under both Oklahoma and Kansas law, it is defendant's burden to show that post-production costs were reasonable, that such costs were incurred to enhance an already marketable product, and that the royalty revenues increased in proportion to such costs.  As the Court in Mittelstaedt held,

---

[5]Inferior Liquids are defined as "[m]ixed crude oil, slop oil, salt water, nuisance liquids, and other liquids recovered by Buyer in its gathering system or at plant inlet receivers."  Id. at A1, ¶ A(g).

9

a royalty interest may bear post-production costs of transporting, blending, compression, and dehydration, when the costs are reasonable, when actual royalty revenues increase in proportion to the costs assessed against the royalty interest, and when the costs are associated with transforming an already marketable product into an enhanced product, and when the lessee meets its burden of showing these facts.

Mittelstaedt, 954 P.2d at 1210.  The Kansas Supreme Court likewise held in Sternberger that

once a marketable product is obtained, reasonable costs incurred to transport or enhance the value of the marketable gas may be charged against nonworking interest owners.  The lessee has the burden of proving the reasonableness of the costs.  Absent a contract providing to the contrary, a non-working interest owner is not obligated to bear any share of production expense, such as compressing, transporting, and processing, undertaken to transform gas into a marketable product.

Sternberger, 894 P.2d at 800.  XTO has not, however, presented evidence to establish the reasonableness of the costs incurred or that royalty revenues increased in proportion to such costs.  See Naylor Farms, Inc., ord. at 5 (Doc. No. 245) ("If the gas had been in a marketable form at the well, the processes DCP performed would either have been unnecessary and only transportation to a pipeline would have been necessary or Defendant QEP could or would have submitted some evidence showing that the processes performed by DCP merely enhanced an already marketable product at a reasonable cost, resulting in proportionately higher royalty revenues.").

10

In addition, the court finds the gas purchase contracts between XTO and Timberland constitute affiliate sales and therefore plaintiffs "are entitled to have their royalty payments based on the prevailing market price or the work-back method, whichever one results in the higher market value." Howell v. Texaco Inc., 112 P.3d 1154, 1160 (Okla. 2004). XTO attempts to distinguish Howell on the basis that the sales in Howell were between divisions of the same company, rather than between separate corporate entities. The court finds that is a distinction without merit under the facts of this case.[6] XTO admits that it initially purchased the assets that were transferred Timberland, and that Timberland was formed for this purpose. Exhibit 4 to Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment for Breach of Contract and Fiduciary Duty at 25, 32 [hereinafter cited as "Plaintiffs' Reply"]. In addition to being wholly owned subsidiaries of XTO, Timberland and CTES share officers and directors with XTO. Indeed, the officers and directors of the three companies are nearly identical, the only difference being that Terry Schultz is an officer of CTES and not of XTO or Timberland, while Nick Dungey is an officer of XTO and Timberland, but not CTES. Plaintiffs' Motion at 10-11 n.15; Exhibit 17 to Plaintiffs' Motion. All of Timberland's board members are XTO

---

[6]Moreover, Kansas law defines an affiliate as "any entity which, directly or indirectly, controls or is controlled by, or is under common control with, the payor." Kan. Stat. Ann. § 55-1622(a)(7). The Oklahoma Oil and Gas Owners' Lien Act of 2010 defines an affiliate as "any person . . . who is controlled, directly or indirectly, by a first purchaser, or . . . who controls, directly or indirectly, a first purchaser." 52 O.S. § 549.2(1). Control "means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership, by contract, or otherwise." Id.

employees.   Exhibit 7 to Plaintiffs' Motion at 47.   Moreover, all Timberland employees are employees of XTO and are paid by XTO.[7]   Exhibit 17 to Plaintiffs' Motion at 44.   The president of Timberland, Nick Dungey, is also XTO's senior vice president for natural gas operations.[8]   Exhibit 4 to Plaintiffs' Reply at 14; Exhibit 11 to Plaintiffs' Motion at 292.   In both positions, he maintains one office – at XTO's offices in Ft. Worth, Texas.   Exhibit 11 to Plaintiffs' Motion at 292.   The two companies use the same legal staff to draft contracts.   Id. at 293.   The court finds the contracts were not arms-length agreements as it is undisputed that they were not "negotiated with an independent third party."   Tara Petroleum Corp. v. Hughey, 630 P.2d 1269, 1275 (Okla. 1981).   The rule announced in Howell therefore applies.   There are, however, issues of fact as to what constitutes "the best price available."   Howell, 112 P.3d at 1160.   At trial, the parties will be permitted to present evidence regarding whether a prevailing market price exists, and if so, what that price is.   In addition, the parties will be permitted to present evidence regarding the work-back method, including the value of the NGLs.[9]   See id.; Katschor v. Eason Oil Co., 63

---

[7]As noted earlier, CTES has no employees.  See supra n.3.

[8]As XTO's senior vice president for natural gas operations, Dungey oversees "the gathering, processing, dehydration, measurement, basically the midstream functions within XTO Energy." Exhibit 4 to Plaintiffs' Reply at 14.  These are precisely the functions that Timberland performs and that Dungey therefore oversees in his position as president of Timberland.

[9]Plaintiffs are entitled to royalty payments based on the value of the gas stream.  See Northern Natural Gas Co. v. Grounds, 666 F.2d 1279, 1286 (10th Cir. 1981), cert. denied, 457 U.S. 1126 (1982) (grant of gas "covered all components of the gas including helium which would entitle the landowners-lessors to one-eighth (1/8th) of the proceeds of the helium marketed from each well").  There is no dispute that NGLs are entrained in the gas stream.  Moreover, the court notes that in contracts XTO entered into with third parties, XTO specifically negotiated for payment to it

P.2d 977, 981 (Okla. 1936).  The court thus grants plaintiffs' motion for summary

judgment with respect to their breach of contract claim to the extent noted above.

The court also grants plaintiffs' motion with respect to whether XTO owes a

fiduciary duty to the Oklahoma class.  While XTO is correct that no fiduciary duty

arises solely from contracts or communitization agreements,

> the Oklahoma Supreme Court has "recognized the
> existence of a fiduciary duty owed by a unit to the royalty
> owners and lessees who are parties to the unitization
> agreement or subject to the order creating the unit.  This
> is not a duty created by the lease agreement, but rather by
> the unitization order and agreement." After unitization, the
> leases no longer control.   Instead, the parties'
> relationships are defined by statute and by Commission
> order.  "The unit organization with its operator stands in a
> position similar to that of a trustee for all who are
> interested in the oil production either as lessees or royalty
> owners."  The fiduciary duty of the unit operator arises not
> only from the creation of field-wide units for secondary
> recovery under 52 O.S. §§ 287.1 - 287.15, but also from
> the creation of drilling and spacing units under 52 O.S.
> Supp. 2007 § 87.1.  The critical factor is the resort to the
> police powers of the state on the part of a lessee in
> unitization proceedings which modify and amend existing
> legal rights.

Hebble v. Shell Western E&P, Inc., 238 P.3d 939, 943 (Okla. App. 2009), *cert.*

*denied* (Okla. 2010), *cert. denied*, 131 S. Ct. 822 (2010) (citations omitted).

The court finds that the Oklahoma class wells are subject to drilling and

spacing orders issued by the Oklahoma Corporation Commission.  As early as May

---

of the value of the NGLs in addition to the value of the residue gas.  Exhibit 5 to Plaintiffs' Reply at
20, ¶¶ 1-2; Exhibit 6 to Plaintiffs' Reply at 3, ¶¶ 5.2-5.3.

1943, the Oklahoma Corporation Commission recognized the need to establish "rules and regulations governing the production of natural gas in the Hugoton Field in order to prevent waste, provide for ratable taking, and fixing allowables of wells so that production and distribution in said field would be fair and equitable".[10]   The May 1943 order was superseded by Order No. 17410 on December 27, 1944, in which the Commission found:

> That there exists in Texas County, Oklahoma, a large gas field known as the Hugoton Field, which extends from the Kansas line on the north to the Texas line on the south, and approximately forty miles east and west; that said field extends north into the State of Kansas, and at least a short distance south into the State of Texas; that the probable productive area in said field in the State of Oklahoma covers most of Texas County, but the exact boundaries and extent thereof cannot be determined with certainty until additional wells are drilled.

Order No. 17140 at 2.   Order No. 17140 was in turn superseded by Order No. 17867, issued May 31, 1945.   Exhibit 2 to Plaintiffs' Motion at 9-19.   In Order No. 17867, the Commission noted that "the Guymon-Hugoton Pool constitutes one common source of supply of gas, although there are three or more producing horizons that are interconnected".   Id. at 10.   The Commission found that drilling units should be established for the Field and "[t]hat all of the royalty owners in a unit

---

[10] *In the Matter of the Application of Walker T. Pound, Conservation Officer, for Rules and Regulations Governing the Ratable Taking of Gas and Allocating the Production in the HUGOTON GAS FIELD in Texas County, Oklahoma*, Order No. 17410 at 2 (Okla. Corp. Comm'n Dec. 27, 1944) located at http://imaging.occeweb.com/AP/Orders/OCC_OG_0LMG5UM_2NT6L88.pdf [hereinafter cited as "Order No. 17410"].

should participate in the proceeds of any well produced in the unit in the ratio that the acreage of the royalty owned bears to the total acreage of the unit." Id. at 12. The Commission noted its "intention to cover all of the productive areas of said common source of supply, and any wells drilled into said common source of supply outside the area described above[11] shall be drilled in the manner and according to the pattern herein described." Id. at 14 (footnote added).  On February 3, 1953, the area spaced by Order No. 17867 was extended to also include Range 18 ECM of Township 1.[12]  The Commission held that "all royalty interests within any spacing unit shall be communitized and each royalty owner within any unit shall participate in the royalty from the well drilled thereon in the relation that the acreage owned by him bears to the total acreage in the unit."  Order No. 26721 at 2.  Subsequent orders issued by the Commission with respect to the Guymon-Hugoton Field recognize that

---

[11]This area included Township 1 North, Ranges 12 to 17 East of the Cimarron Meridian ("ECM"); Townships 2, 3, and 4 North, Ranges 12 to 18 ECM; and Townships 5 and 6 North, Ranges 12 to 16 ECM. Id. at 14. In subsequent orders, the Commission extended the area to relevant sections of Township 4 North, Range 19 ECM. *In the Matter of Proper Drilling and Spacing Units for the Morrow (SO. 719) by Amending Order No. 28160, as Amended; and by Establishing Units for the Chester Underlying Sections 11, 12, 14, 23 and 24, Township 4 North, Range 18 ECM, and Sections 18 and 19, Township 4 North, Range 19 ECM, Texas County, Oklahoma*, Order No. 75135 (Okla. Corp. Comm'n June 12, 1969), located at http://imaging.occeweb.com/AP/Orders/OCC_OG_3H7SBBI_1O5G0V4.pdf; *In the Matter of the Application of Eason Oil Company for an Order Extending Morrow and Chester Spacing to Include an Area in Township 4 North, Range 19 ECM, Texas County, Oklahoma*, Order No. 92143 (Okla. Corp. Comm'n July 18, 1972), located at http://imaging.occeweb.com/AP/Orders/OCC_OG_05V 9TKO_17KCIRK.pdf.

[12]*In the Matter of the Application of Stanolind Oil and Gas Company to Enlarge the Area Covered by Order No. 17867 (CD983) to Include All of Township One (1) North, Range Eighteen (18) East of the Cimarron Meridian, Texas County, Oklahoma, for the Development of, and the Production of Gas From, the Guymon Hugoton Pool, Texas County, Oklahoma*, Order. No. 26721 at 2 (Okla. Corp. Comm'n Feb. 3, 1953), located at http://imaging.occeweb.com/AP/Orders/OCC _OG_30H3EJ6_1TIVBIM.pdf [hereinafter cited as "Order No. 26721"].

Order No. 17867 constitutes a drilling and spacing order.[13]  The court has conducted

an extensive review of Commission orders related to the Field[14] and has found no

orders that are contrary to the Commission's intent as articulated in 1945 "to cover

all of the productive areas of said common source of supply".[15]  All of the Oklahoma

class wells produce from that common source of supply.  All are subject to drilling

and spacing orders, and XTO as the operator owes a fiduciary duty "to properly

account for and distribute . . . gas proceeds from the units."  Hebble, 238 P.3d at

943.[16]  Whether XTO has violated that duty with respect to the Oklahoma class

remains a question of fact.

---

[13]See Order No. 26721 at 1 ("Order No. 17867, establishing drilling and spacing units for the production of gas from the Guymon-Hugoton Pool"); In the Matter of the Application of Plains Natural Gas Company, a Corporation, for an Order Unitizing and Pooling All Oil and Gas Interests and Determining the Rights and Equities of the Owners of Such Interests in the Drilling and Spacing Unit Described as Section 25, Township 6, North, Range 18 ECM in Texas County, Oklahoma, Order No. 24395 at 1 (Okla. Corp. Comm'n Jan. 26, 1951) ("by Order No. 17867 the Corporation Commission established drilling and spacing units for the production of natural gas in the Guymon Hugoton Pool").

[14]In addition to the orders attached as Exhibit 2 to Plaintiffs' Motion, the court has also reviewed the following orders (listed by Order No. only):  16377; 17410; 20742; 22830; 23498; 23704; 24395; 26721; 27102; 36361; 48447; 48448; 64458; 68188; 69150; 75135; 92142; 92143; 112563; 128367; 136532; 143591; 173755; and 318330.  All Corporation Commission orders can be located on the World Wide Web at http://imaging.occeweb.com/imaging/OAP.aspx.

[15]Exhibit 2 to Plaintiffs' Motion at 12.

[16]XTO argues that plaintiffs "failed to cite any authority holding that a fiduciary duty existed under § 87, which was repealed in 1947."  Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment and Brief in Support at 27 (Doc. No. 302).  While it is true that Order No. 17867 was not issued pursuant to 52 O.S. § 87.1, that is  because the order was issued prior to enactment of § 87.1.  Nonetheless, the court does not find this determinative.  There is no doubt the Commission had the authority to issue Order No. 17867 and that it was issued pursuant to "the police powers of the state".  That is the key.

16

The law in Kansas is not so clear.  Plaintiffs recognize that Kansas courts have not have held that a fiduciary duty arises out of a unitization order, but ask the court to find that the Kansas Supreme Court would follow Oklahoma law in this regard.  In the alternative, plaintiffs argue XTO owes the Kansas class a fiduciary duty because Timberland receives and holds funds for the benefit of the royalty owners.  Plaintiffs contend XTO is the alter ego of Timberland and therefore is chargeable with Timberland's duty to properly account for and to distribute the class funds.

The court finds plaintiffs have not demonstrated Kansas courts would follow Oklahoma law regarding the effect of unitization orders.  It is noteworthy that the Kansas proration order governing the Hugoton Field submitted by plaintiffs *permits* pooling, but does not require it.  Exhibit 3 to Plaintiffs' Motion at 10.  Rather, such action is a matter of contract as the order provides

> [i]t shall be *lawful* for the owners of two, or more, separately owned tracts of such land, or, of the minerals located thereunder, *by appropriate contract* between such owners to cause such lands or minerals to be consolidated as one production unit and to apportion the royalties accruing from the production of the well or wells, to be divided among them as they may agree and when such agreement shall have been made, the royalties arising from the production of the well or wells shall be allocated as the parties thereto may agree.

Id. (emphasis added).

The court also finds that plaintiffs have not established that they are entitled to judgment as a matter of law on their alternative theory of liability. In general, a corporation is a separate entity from its owner. Louisburg Bldg. & Dev. Co. v. Albright, 252 P.3d 597, 608 (Kan. App. 2011). The corporate entity, however, may be disregarded if the corporation's owner is found to be the alter ego of the corporation. Id. at 609.

> The concept that one corporation can be found to be the alter ego of another corporation is a well-established doctrine in Kansas law, but examples of its application in a parent-subsidiary corporate context are rare. . . . The ultimate test for imposing alter ego status is whether, from all of the facts and circumstances, it is apparent that the relationship between the parent and subsidiary is so dominating, and the business and assets of the two are so mingled that recognition of the subsidiary would result in an injustice to third parties. In addition to the factors used to determine a corporate alter ego status, a plaintiff must show that allowing the legal fiction of a separate corporate structure would result in injustice toward the plaintiff.

Doughty v. CSX Transp., Inc., 905 P.2d 106, 111 (Kan. 1995). Moreover, "[m]erely showing that some kind of injustice occurred is not sufficient – to disregard the corporate entity . . . it must be 'necessary to achieve equity.'" Albright, 252 P.2d at 610 (citation omitted). Whether a parent corporation is the alter ego of its subsidiary is a question of fact,[17] and the court finds there are sufficient questions with respect

---

[17]Doughty, at 114.

to a number of the factors to be considered[18] that plaintiffs are not entitled to summary judgment on this issue.

In sum, Plaintiffs' Motion for Partial Summary Judgment for Breach of Contract and Fiduciary Duty (Doc. No. 292) is GRANTED in part and DENIED in part.

It is so ordered this 8th day of March, 2012.

_Tim Leonard_
TIM LEONARD
United States District Judge

---

[18]There is no dispute with respect to a number of the ten factors to be considered.  *See* Doughty, 905 P.2d at 111.  XTO owns all of Timberland's stock, the corporations have common officers and directors, XTO caused Timberland's incorporation, XTO pays the salaries of Timberland's employees, and a substantial amount of Timberland's business is with XTO and is accomplished with assets conveyed to it by XTO.  The parties, however, dispute whether Timberland "has grossly inadequate capital", whether Timberland is referred to as a division or department of XTO, whether the directors or executives "do not act independently in the interest of the subsidiary but take direction from the parent corporation", and whether formal legal requirements are observed.  Id.